## PERRY *v.* THE STATE.

1. Although an order for the holding of a special term of a superior court
   may recite "that there is important business pending in that court, . .
   and that it is to the interest of the county" that such special term be
   held "for the trial of the same," it is nevertheless lawful, at the special
   term, to dispose of any business properly coming before the court, whether
   the same was pending therein when the order was passed or not. Where
   such an order expressly directs the drawing of a grand jury for the spe-
   cial term, it obviously contemplates the trial at that term of any indict-
   ment which may then be returned.
2. A writing signed by a person since deceased, when in articulo mortis and
   conscious of his condition, is, when accompanied by evidence showing
   that it was read over to him, that he understood its contents, and that he
   intended it as his dying declaration, admissible in evidence so far as it re-
   lates to "the cause of his death and the person who killed him," no matter
   when, or by whom, it is prepared, the circumstances attending its prep-
   aration and any question as to whether or not the deceased understood
   its contents being for consideration by the jury in determining what
   weight should be attached to such declaration.
3. Where a specified portion of such a declaration relates to events occurring
   a considerable time before the homicide and does not fall within the pro-
   visions of the statute under which dying declarations are admitted in evi-
   dence, such portion, upon a distinct objection thereto properly and duly
   made, should be excluded; but erroneously allowing it to go to the jury
   is not cause for a new trial, when it could neither have had any bearing
   whatever upon the question of the guilt or innocence of the accused, nor
   in any manner have operated to his prejudice.
4. While it is the right of one on trial for murder to attack, when put in evi-
   dence against him, the dying declarations of the deceased, by proving his

general bad character, the refusal of a continuance to enable the accused to produce evidence for this purpose is not cause for a new trial, when, independently of the dying declarations, his guilt was unequivocally established, and the record as a whole conclusively shows that being deprived of the impeaching evidence did him no injury.

5. Whether this court should deal with the errors pointed out in the two preceding notes exclusively with reference to their bearing upon the correctness of the jury's conclusion of fact that the accused was guilty of the crime of murder, or should also, in this connection, consider the question whether or not these errors in any manner contributed to the refusal by the jury to relieve the accused of the death penalty by recommending his imprisonment for life, there should be no new trial in the present case. This is beyond doubt true if the duty of this court in this respect is limited as first above indicated; and even if such duty extends to making the additional inquiry suggested, the answer thereto which the record imperatively demands is, that neither the refusal of the continuance, nor admitting the illegal evidence, nor both combined, when these matters are considered in the light of the undisputed facts of this case and of the statement of the accused, ought to, or in any degree of probability would, have caused any modification of the general verdict of guilty in which the trial resulted.

6. An instruction in a trial for murder, to the effect that it is immaterial from what source malice springs, does not interfere with or abridge "the prerogative of the jury to recommend imprisonment for life"; nor is it, in such a trial, erroneous to charge that the malice "need not exist for any length of time" previous to the homicide.

7. It being manifestly true that the presumption of malice which the law raises from proof of a homicide may be rebutted by any evidence introduced at the trial, whether by the State or by the accused, the following charge was erroneous: "When the homicide is proved by the State to be the act of the defendant, the law presumes malice; and unless the evidence offered to prove the homicide should relieve the defendant, or mitigate the crime, he should be found guilty of murder, as charged."

(a) This charge, in the present case, did the accused no injury, because there was nothing in the evidence offered by him which could have reduced the grade of the homicide below that of murder.

8. Where in such a trial it was conclusively proved that the accused deliberately armed himself with deadly weapons for the purpose of killing the deceased, and with one of them accomplished this purpose, a charge that providing weapons was a circumstance which the jury were authorized to consider in determining whether or not there was malice, was not harmful to the accused because it failed to state that the purpose for which the weapons were provided should also be considered in passing upon the question of malice.

9. A charge to the effect that a homicide committed on Monday could not be justified by proof of an offense committed upon the wife of the accused on the preceding Friday was certainly correct; and the fact that the latter, in his statement, claimed that he did not until Saturday know of the crime which he alleged had been committed upon his wife by the de-

ceased on Friday, did not render the charge erroneous; for though it may not have been precisely adapted to the facts in issue, it was, as an abstract proposition, sound law.

10. One against whom, or whose wife, an offense, no matter how heinous, has been committed, can not in law be justified "in taking vengeance in his own hands and in deliberately seeking out and following up the wrong-doer and slaying him."

11. The question of "cooling time" can not arise, and the law of voluntary manslaughter has no application, in a case where the slayer premeditated the homicide, made careful preparations to take the life of the deceased, and, after hunting him down, deliberately slew him.

12. Where it appears that the judge gave in charge to the jury the statutory provisions relating to the prisoner's statement, an assignment of error complaining of a failure to give any instruction "as to what legal effect the statement of the defendant should have, if such statement was believed by the jury," but not pointing out what the accused contended this effect should be, or what particular instruction should have been given in this connection, is without merit.

13. It is not, in a criminal trial, erroneous to prevent counsel, in opening the defense, from making lengthy and argumentative statements as to irrelevant matters, or from stating what could be proved by the wife of the accused, she being, in such case, an incompetent witness for any purpose.

14. The grounds of the motion for a new trial, save as to certain of them which present no new question of law and which do not disclose the commission of any error, and certain others not approved by the trial judge, are covered by the preceding notes; the evidence made a plain and unmistakable case of wilful and deliberately premeditated murder; the statement of the accused was practically a confession of guilt, and it is certain that the jury did not believe that portion of the same alleging the reason for which the homicide was committed. There is nothing in the record which would warrant this court in disturbing the general verdict of guilty which the jury rendered.

ATKINSON and COBB, JJ., dissenting. 1. Under the provisions of the Penal Code, murder is a capital felony only when the jury upon the final trial fail, upon finding a verdict of guilty, to recommend the accused to the mercy of the court or that he be imprisoned in the penitentiary for life, and in making such recommendation no limitations are or can be imposed either upon their discretion or their power. Upon the question of punishment, as upon all others, the accused is entitled to be tried in accordance with law; and therefore if the trial judge should illegally admit evidence which would injuriously affect his interest, or illegally withhold from the jury relevant evidence which would be beneficial to him in determining that question, such action is necessarily prejudicial to the accused; and this court can not properly hold as matter of law, even though the evidence demanded a verdict of guilty, that the admitting or withholding of such evidence would not or ought not to have influenced the jury to add to the verdict of guilty such a recommendation as would have reduced the offense below the grade of capital felony.

2. That "the evidence made a plain and unmistakable case of wilful and

deliberately premeditated murder," that "the statement of the accused was practically a confession of guilt," and that "it is certain that the jury did not believe that portion of the same alleging the reason for which the homicide was committed," are no valid reasons for sustaining a general verdict of guilty, when the record clearly discloses that errors were committed which were calculated to prejudice the accused when the jury should have under consideration the question of punishment.

Argued June 21, — Decided July 21, 1897.

*On application for mandamus nisi.*

1. The Supreme Court will not by mandamus compel a judge of the superior court to certify a bill of exceptions assigning error upon his refusal to entertain an extraordinary motion for a new trial, based solely upon the ground of newly discovered evidence, when it appears that such evidence could not be legally admitted in case a new trial should be ordered.

2. It would not, in a trial for murder, be competent for the accused to introduce evidence of a declaration by the deceased, not communicated to the accused before the homicide, to the effect that the deceased had committed upon the wife of the accused a felonious criminal assault.

Argued August 9, — Decided August 10, 1897.

Indictment for murder. Before Judge Candler. DeKalb superior court. Special term, April, 1897.

*Hoke Smith & H. C. Peeples, R. B. Russell, T. M. Peeples* and *Braswell & Smith,* for plaintiff in error.

*J. M. Terrell, attorney-general, W. T. Kimsey, solicitor-general, Glenn & Rountree* and *John R. Cooper,* contra.

LUMPKIN, P. J.   On Monday, March 8th, 1897, H. S. Perry, with a pistol, inflicted upon N. B. Lanier wounds from which he subsequently died.   Perry was indicted for murder, and the facts of the case, as established at the trial, are as follows: Lanier had for some time been a boarder at a house occupied by Perry and his wife on Piedmont avenue, in the city of Atlanta, which, for convenience, will hereinafter be designated as "Perry's house."   The relations existing between Lanier and Perry had been quite intimate and friendly.   It was the habit of Lanier to address Perry as "Uncle Steve," and there was no hostility or ill-will between them prior to Friday, March 5th.   Lanier slept that night in Perry's house, and took both his breakfast and his dinner there on the following day. In the afternoon he received from Perry a written communication in these words:

"I write you this note to inform you I am aware of the manner in which you have destroyed my happiness by coming in between me and my wife. Now, you low-down, black-hearted, deceitful scoundrel, I will give you from the time you receive this note until (9) nine o'clock to-night to leave this city. And I mean for you not to stop where I will ever see or hear tell of you again. If you fail to do either of these requests, when I lay eyes on you, you may be prepared to risk the consequence that will follow, you damned, low-down rascal."

Lanier left the city that night, went to the home of an uncle at Kirkwood, named John Peters, and remained there until the following Monday morning. On Sunday, while at his uncle's home, he wrote and sent to Perry a letter which was found on the person of the latter after he shot and mortally wounded Lanier. That letter was as follows:

"It is very humiliating to mee; that is, to think of the pass. I do not understand why you have written mee such a noat. I do not know why it is that you want to take my life from mee. I am not guilty of the charges of death. I have tried to make peas with you, but if it is your desire to shoot mee down like I was a dog, I can stand to see my body riddle. Uncle Steve, you may wish to shoot mee down, but let me say before my God that you had better shoot some others down before me, although that is not my business. I will say as to myself I will never bother you any more. I have always loved you and have tried to get you to think well of me. Uncle Steve, there is another day after death. You have asked mee to leave the City at once. Could you have the heart to deprive mee of my home and to go where I have got no mother, no money, no friends? I have not don anything to be shot down for. I do not wish to leave the City. If I do, it will disgrace you and myself. I well know I have told your wife some things that I should not have told, but it was for your good and not for mine, so I was lead into this. Uncle Steve, I have suffered two deaths every since I received that noat. Why did you write that noat? You could have come to the Store and shot mee down than to send that noat, for the respect that I have for you I would rather be dead than to live.

24

God knows my heart, I do not understand.   I thought to myself this is a dream.   Would to God it was.   So I will bid you farewell until we meet again, so good bye untill death.

"P. S.   Pleas do not shoot me unless you think you can kill mee dead on the spot.   I dont wish to suffer, for I have done nothing to leave the City for, and I had rather be shot with an innocent heart than with a guilty one.   So good bye."

Perry began on Saturday night a search for Lanier, and continued it until Sunday night.   During Sunday he went to the place of John Peters, looking for Lanier, but stopped at the gate and did not enter the house.   The next morning, Lanier left this house, intending to go to his father's.   In pursuance of this purpose, he took a train of the Georgia railroad at Decatur.   Perry was already on this train, having taken it in Atlanta.   He was still in quest of Lanier, and was armed with two (and probably three) concealed pistols.   It so happened that Lanier entered the car in which Perry was riding. The latter seized Lanier's arm and led him into another car, remarking: "I want to talk with you, and when I get through with you, death will be your portion."   Lanier then said: "Uncle Steve, don't shoot me like I was a dog."   Perry made no reply to this.   At that moment he had Lanier's right hand in his left, and a man named E. D. Peters had hold of Perry's right arm.   Perry asked Peters: "Have you got anything to do with this?"   Peters said, "No, sir"; and thereupon Perry released his hold of Lanier and began to search Peters to ascertain whether or not he was armed.   Lanier immediately ran and jumped from the train, which was just then leaving Ingleside.   Perry pursued him and chased him up the railroad, firing at him three times as he ran, none of the shots, however, taking effect upon Lanier, who continued to run until he reached and took refuge in the house of one B. O. Fusselle. Several men then appeared upon the scene, and after some conversation had taken place, in the course of which Perry charged that Lanier had committed an outrage upon his wife and declared that he wanted him arrested, both of them were taken into custody and searched.   Lanier submitted readily to the arrest.   Perry made a slight protest against being arrested,

but did not offer serious resistance. A small pistol which he had made no attempt to use was taken from the person of Lanier, and one pistol was taken from the person of Perry. Lanier was then tied, and he and Perry placed in a wagon and carried to the court-house in Decatur. Nothing of special importance occurred on the way. When the court-house was reached, Lanier was taken into the building, and Perry, whose movements were apparently unrestrained by any one, came along behind him. As they were thus proceeding, all of the persons just referred to being in the court-house, Perry shot Lanier from his rear with a large pistol. Lanier fell instantly to the floor, and Perry, rushing up to him, fired a second shot into him while he was down. Perry then declared that he had accomplished what he came to do, and offered to submit to an arrest. Lanier died from the wounds thus inflicted upon him.

The facts above set forth were conclusively proved at the trial. Indeed, they were not contested. The only defense which Perry attempted to set up was embodied in his statement to the jury. In substance, that statement was as follows: On the night of Friday, March 5, he found his wife weeping and complaining of feeling badly, but in response to his importunities she refused to disclose to him the cause of her unhappiness. The next day, Saturday, March 6, about half past two in the afternoon, she said to him: "Mr. Lanier has treated me in a manner that will ruin our future happiness." She broke down at this point, and would tell Perry nothing more. He left his house under the impression that Lanier had made his wife an improper proposal or insulted her slightly about something. That night, however, she further informed him that Lanier, under the pretense of getting her to pour some oil in his ear, which he said was aching, had on Friday afternoon enticed her into his room; that, at the point of a pistol, he had then committed a rape upon her, and had threatened to kill both her and her husband if she ever told him of this outrage. She assigned this threat as her reason for not sooner telling her husband all that had occurred. As soon as he learned from her the full extent of Lanier's conduct, he began to search for him, but was unable

to find him until the following Monday morning. His object in resuming the search that morning was to have Lanier arrested and punished for his offense. When he first saw Lanier on the train, he had no intention of shooting the latter, but at the thought of his outraged wife and of his children, he seized Lanier and dragged him from the ladies' car into the smoking-car. E. D. Peters, who was present, kept his hand upon his pocket as if he had a weapon; and, thinking that both men were going to be against him, Perry released Lanier, who jumped from the train and fled. Perry pursued, and Lanier faced him, pistol in hand. Then Perry fired his first shot, and subsequently two others. After they were arrested at Fusselle's, and as they proceeded to Decatur in the wagon, Perry kept thinking of the outrage which Lanier had committed. The statement concluded in these words: "I tried to control myself, but the more I thought of it the more miserable I got. I still had a gun in my pocket; and when we reached this place here and got out of the wagon and started to the house, gentlemen, I don't know what I did or what I said, but it seemed to me that they gathered around and that these people were saying, 'You contemptible coward, why don't you protect your wife?' Gentlemen, that was the feeling of my heart. My life was worth nothing to me. I couldn't live, it seemed like; and when we entered the door, before I knew what I done, I drew the gun and shot him. I shot him the second time, and the feelings I had were no more than if I had shot a snake or a mad dog. Gentlemen, whenever you all have occasion to be in this place, I guess you will feel the same way. I never felt more relieved than I did at that time. I felt that the man would never be spared to wrong my wife or any other lady in a like manner. I was so overcome with the great shock, I will acknowledge that I was so overcome that I didn't know what I was doing. The ride from Ingleside up here seemed like a dream to me, and I feel that there isn't a man on that jury that is such a coward, if he would be placed in the place I have been in, but what he wouldn't do less than I did. Gentlemen, this is the whole of it. That is why I did what I did."

There was some evidence tending to show that Mrs. Perry

had, on Friday afternoon, warmed some oil in the kitchen and had gone with it to Lanier's room, and also that soon afterwards a noise was heard in that room which might have been caused by some kind of a struggle.   There was also other evidence tending to show that Perry had been fond of and very intimate with a lewd woman; that he had frequented houses of ill fame; that Lanier, at Mrs. Perry's request, had kept watch upon Perry and informed her of his conduct in this respect; that this was Perry's real grievance against Lanier, and that for this cause alone he hunted Lanier to his death.   This theory is borne out by the following expression in the above quoted letter written by Lanier to Perry: "I well know I have told your wife some things that I should not have told, but it was for your good and not for mine, so I was lead into this."

The trial resulted in a general verdict of guilty, and Perry was sentenced to be executed.   He moved for a new trial; the motion was overruled, and he excepted.   After this court had affirmed the judgment of the court below, Perry filed an "extraordinary" motion for a new trial, based upon newly discovered evidence to the effect that Lanier had admitted committing a rape upon Mrs. Perry; but it was not claimed that any knowledge of this alleged admission was communicated to Perry before the homicide.   The trial judge refused to entertain this motion for a new trial or to grant a rule nisi therein, and also refused to certify a bill of exceptions complaining of this action as erroneous.   Thereupon, an application was made to this court for a mandamus to compel the judge to certify this last bill of exceptions.   This application was denied. Justices Atkinson and Cobb dissented from the judgment rendered in the main case, but all concur in the judgment denying the mandamus.   The legal questions presented for decision are indicated in the headnotes, and will now be discussed. As will be perceived, there were some errors at the trial.   These will be pointed out as we proceed.   A majority of the court are fully satisfied that notwithstanding these errors a new trial should not be granted.   In the last division of this opinion we will undertake to show that this conclusion is in accord with both the law and justice of the case.

1. There was no merit in the point that the accused could not be lawfully tried at the special term, though the order under which it was held contained the recitals quoted in the first headnote, and though no indictment had been returned against Perry when that order was passed. A superior court, legally in session, may attend to any business coming before it. Certainly, when an order for the holding of a special term directs that a grand jury be drawn for that term, it obviously contemplates that any indictment then returned will be in order for trial.

2. No reason occurs to us why a written dying declaration otherwise meeting the legal requirements as to admissibility should be excluded; nor does it matter that it was reduced to writing by one other than the declarant. If he understood its contents and deliberately signed it as his dying declaration, it would seem to be more reliable evidence of what he actually stated than could be obtained from a witness, or witnesses, the correctness of whose testimony in this respect necessarily depended upon memory alone. In every such case the jury are to decide whether or not the written declaration is a genuine expression of what the declarant really desired to say, and in weighing it they should take into consideration all the facts and circumstances concerning its preparation and execution. Of course, such a declaration is, like a spoken dying declaration, admissible only to the extent indicated by section 1000 of the Penal Code, viz., in so far only as it relates to the cause of the declarant's death and the person who killed him.

3. Complaint is made in the motion for a new trial, that the court erred in admitting in evidence specified portions of Lanier's dying declaration. Some of these related to alleged visits by Perry to a lewd woman on Collins street, in Atlanta, months before the homicide, and to an exhibition by Perry of bad feeling towards Lanier on Friday evening before the tragedy; and another was in the following words: "There was nothing at any time improper in my relations to Mrs. Perry. I did not, on Friday night or at any other time and place, offer her any insult or violence, or commit any assault upon her, or have any improper relations with her. I have always

had the greatest respect for Mrs. Perry, and she has always conducted herself as a lady towards me. I did not accompany Mrs. Perry to any house, or meet her at any house on Collins street or elsewhere, or at any other place, on Friday night before the shooting, or at any other time." It is clear that some, if not all, of the evidence above referred to should have been rejected. The purposes for which dying declarations may be introduced are, under the section of our code just cited and the general and well-settled rules of law applicable, limited; and accordingly, such declarations are not admissible to prove events occurring any considerable period before the homicide, or which are not directly connected with its perpetration.

4. When dying declarations are introduced against a person on trial for murder, it is his right to attack the same by proving the general bad character of the deceased. In the present case, counsel for the accused moved for a continuance in order to obtain evidence for this purpose. Their motion was refused. Under different circumstances such a refusal might afford cause for a new trial. In this instance the accused was not, as four of us think, injured by being deprived of this impeaching evidence.

5. Such observations as are deemed appropriate in connection with the ruling announced in the fifth headnote will be embraced in the general review of this case at the conclusion of this opinion.

6. If a homicide was committed with malice—that is, if there was nothing to either justify the act or reduce it below the grade of murder,—it can not matter from what source the malice, viz., the deliberate intention unlawfully to kill, sprang; nor, in law, can it make any difference that such intention existed for but a limited period of time before the same was put into execution. It follows that such charges as are referred to in the sixth headnote were not erroneous. Certainly, they contained nothing interfering with the exercise by the jury of their legal right to make or withhold a recommendation of imprisonment for life.

7. The court obviously erred in giving the instruction quoted in the seventh headnote, which briefly, but sufficiently, states

wherein the error consisted. It also shows why this particular error was harmless to the accused.

8. In giving the charge to which the eighth headnote relates, the court was simply stating a familiar principle of law. Even if it was defective for the reason assigned, it was not, in view of the uncontroverted facts, capable of being given an application which could possibly, in a legal sense, have been injurious to the accused.

9. Unquestionably, a homicide committed on Monday could not be justified by proving that on the preceding Friday the deceased had committed an offense upon the wife of the accused; and this would be equally true if the crime of the deceased had been done on the Saturday after that Friday. Assuming, then, that though such a crime was committed on Friday the husband did not know of it until the next day, and on the following Monday hunted down and killed the offender, he would be in no better position than if the knowledge on which he acted had come to him on the very day of the offense which provoked his subsequent act of vengeance.

10. The rule of law laid down in the tenth headnote is too ancient, too thoroughly settled, and too well known, to require any argument to prove its correctness.

11. In the light of the facts, the court certainly did not err in refusing to charge upon the law of voluntary manslaughter. It had not the remotest bearing upon the case, nor was the question of "cooling time" in the slightest degree involved. The killing was not done in hot blood. It was deliberately premeditated, carefully planned, and remorselessly executed. To have charged on either of these subjects would have made the trial a solemn mockery of law and justice.

12. The court correctly gave in charge to the jury the law relating to the prisoner's statement. It is assigned as error that the judge did not tell them what legal effect should be given to the statement in case they believed it; but the motion for a new trial contains nothing indicating what the accused contended this effect should be, or in what phraseology the desired, but omitted, instruction should have been expressed. The silence of the motion in this respect is significant.

The truth is, the "effect" of the statement made in this case was to require a finding that the accused was guilty of murder. It would not have been proper for the judge to so inform the jury, and his failure to do so affords the accused no good ground of complaint.

13. We are quite sure that the ruling announced in the thirteenth headnote will be accepted as sound. It deals with matters presented by the motion for a new trial. We leave it to stand without comment.

14. This brings us to a general review of the whole case. It presents but a single question open to any serious doubt, viz., whether or not the errors committed at the trial entitled the accused to a new hearing *for the purpose of endeavoring to obtain a recommendation to life imprisonment.* This was really the only issue at the trial. It would necessarily be the only issue at any subsequent trial, should the judgment be reversed. It can not be urged that another honest jury could by any possibility do less than convict the accused of murder. To assume that any jury would do otherwise would be to impute to them a wilful purpose to corruptly disregard their oaths. There never was a plainer case of murder made out in the court-house. The evidence shows the guilt of the accused as conclusively as human testimony can establish anything, and his statement was neither more nor less than a confession of guilt. The settled law of homicide as applied to the facts leaves no room for any other conclusion than that this was a plain and unmistakable case of deliberately premeditated murder. The jury might, if they had seen proper to do so, have recommended that this crime be punished by imprisonment for life, instead of by death. The fact that they did not choose to exercise in favorem vitæ the power which they undoubtedly had in this respect furnishes a most conclusive and satisfactory reason for asserting that they did not believe that portion of the statement alleging the reason for which the homicide was committed. It is inconceivable that any jury in this country would send a man to the gallows for slaying upon the first opportunity another whom he honestly believed had committed a rape upon his wife. The letter which Perry addressed to Lanier is not in the

language which a man would use to one who had committed such an outrage upon the writer's wife. This letter much more clearly indicates that Perry was actuated by a grievance of an altogether different kind. The charge that Lanier had destroyed his happiness by coming between him and his wife could mean either that Perry believed Lanier had seduced Mrs. Perry, or that he had told her of Perry's improper relations with another woman. It could not possibly mean that Perry had been informed of a rape by Lanier upon Mrs. Perry. As a reply to this obviously correct view, it was contended that Perry did not, when he wrote this letter, know the real nature of Lanier's alleged offense. He says in his statement to the jury that his wife did not tell him what had actually happened until Saturday night, and this was after the letter to Lanier had been written. In order, however, to accept this explanation of the matter, it would be necessary to believe: first, that Lanier did really commit a rape upon Mrs. Perry upon Friday afternoon; and second, that she did not tell her husband about it until Saturday night. This, we think, is imposing too severe a strain upon human credulity. It could not possibly be true that any man, however bold and reckless, would commit a rape upon a woman and then sleep under the same roof with her and her husband and take two meals the next day in the same house, trusting for his security to the wife's remaining silent because of a threat that he would kill both her and her husband if she told what had occurred. Certainly, a man of Lanier's small courage would never have dared to pursue this course. Aside from this, the location of Perry's house upon one of the most public streets and near the center of a populous city, and scores of other circumstances which might be mentioned, render the rape story utterly unworthy of serious consideration. There is still another and unanswerable reason for disregarding it. If such a crime had been committed on Mrs. Perry, she would have revealed the fact to her husband at the very first opportunity. A natural and irresistible impulse would have made her do so, without a question from him; and even if it had been otherwise, she could not, when urged by him in the manner stated to tell why she wept and

complained of feeling badly, possibly have failed to at once disclose the whole truth.

Assuming then, and it is surely proper so to do, that Perry's excuse for murdering Lanier was a mere pretext, and that he really committed this terrible crime because his victim had unwisely informed his wife of his own misdeeds, the proposition that he deserved the death penalty is overwhelmingly established. Ought this court, then, to give him another opportunity to have the punishment modified? Is it to be supposed that another jury would view the case more leniently? Ought any jury in christendom to dispose of such a case otherwise than has already been done in this instance? We gravely doubt whether, in any case, it would be right for this court, when fully satisfied that a verdict finding the accused guilty of murder was absolutely demanded, to set the same aside simply because it would be legally possible for another jury to recommend that the accused be punished by imprisonment for life. This doubt becomes all the more serious when, as to the verdict under review, it is manifest that the jury's omission to recommend life imprisonment was perfectly proper and just. While it can not be said that a verdict imposing capital punishment is ever, under our law, demanded, this court certainly has, in a given case, the power to say that such a verdict is right. Our penal statutes abound in instances where juries may make recommendations, some imperative and others advisory only, as to the punishment of the accused. If the courts ever begin to grant new trials solely with reference to the question of changing penalties, they will embark upon a wide ocean of uncertainty. What evidence, other than such as would be pertinent to the question of guilty or not guilty, would be appropriate? An answer to this inquiry is suggestive of endless irrelevancy. Could the accused be allowed to prove his gallantry as a soldier, his respectable family connections, his deeds of charity, or other like things? Where would the investigation end?

This court has frequently decided that the judge can not properly undertake to give to the jury any rules to aid them in reaching a conclusion as to what they should do upon the

question of punishment. See *Inman* v. *State*, 72 *Ga.* 269, 280; *Marshall* v. *State*, 74 *Ga.* 32; *Fry* v. *State*, 81 *Ga.* 646, 650; *Vann* v. *State*, 83 *Ga.* 46, 56, 57; and there are other cases to the same effect. It by no means follows that the jury should capriciously exercise their power in this respect. The law does not mean, nor will it do to assume, that jurors may, or will, be guided in so important a matter by mere whim, or by prejudice one way or the other, or by any improper consideration. They have a broad discretion, it is true, but one which the law-making power intended should be wisely and prudently exercised, *in the light of the evidence.* Surely it was never contemplated that they might, without regard to the facts and circumstances of the case, arbitrarily and without reason act upon the question of punishment. As we understand it, they should, in a murder case, by saying nothing upon this question, allow the penalty of death to be inflicted, unless in their deliberate judgment it is, in view of all the proof, right and proper to spare the murderer's life and send him to the penitentiary.

The proposition laid down by our dissenting brethren, that murder is a capital felony only when the jury fail to recommend imprisonment for life, does not put this matter in the proper light. This implies that the rule is life imprisonment with the death penalty as the exception. It is exactly the other way. The rule is that the penalty shall be death, and life imprisonment the exception. The Penal Code, § 63, declares: "The punishment of persons convicted of murder *shall* be death, but *may* be imprisonment in the penitentiary for life in the following cases," and then proceeds to set forth how the death penalty may be averted. Primarily, then, murder *is* a capital felony, the punishment of which *may be* mitigated in the manner prescribed.

The foregoing suggestions present some of the reasons why a majority of us feel that this court should hesitate, in a perfectly plain case of murder, to order a new trial at which there could be no practical question but one relating to the penalty to be inflicted. But granting that a case might arise in which there would be reason for apprehending that the trial judge committed errors which contributed to the jury's refusal to re-

lieve the accused of the death penalty, and that on this account he should be given another hearing, we feel safe in holding that the present is not such a case. We have already, in plain terms but with what we believe to be perfect fairness, given a true picture of it. Rarely, if ever, in the annals of crime, has there been a more indefensible, a more cruel, or a more cold-blooded murder. We implicitly believe that if there had been no error at all, the verdict would have been the same. We know that it was in all respects exactly what it should have been. We are confident that a new trial would have the same result, and we are certain that no other would fully meet the ends of justice. For these reasons, four of us are satisfied that it is our solemn and imperative duty to let the verdict and judgment stand just as they are written.

There was obviously no error in refusing to certify the second bill of exceptions. The "extraordinary" motion for a new trial was without merit. Testimony to the effect that Lanier confessed to having committed a rape upon Mrs. Perry would not, in a trial of Perry for murder, be admissible to prove that there had been such a rape. For this purpose, it would be hearsay only. Nor would such testimony be competent as tending to explain Perry's motives, unless it appeared that he had knowledge of the alleged confession before the homicide. It was not contended that he had been informed of any such confession until long after Lanier was in his grave. It is therefore not now, in a legal sense, material whether he ever in fact made a confession of this kind or not; but we can not forbear saying that this entire record negatives in the strongest possible manner his having done so. It was certainly remarkable if he confessed a crime which there is every reason to believe was never perpetrated.

*Judgment in the main case affirmed. Atkinson and Cobb, JJ., dissenting; the other Justices concurring.*

*Application for mandamus denied. All the Justices concurring.*

ATKINSON and COBB, JJ., dissenting. We can not concur in the judgment rendered in this case. We think a new trial should have been granted upon two grounds which appear in the motion. First, the ground which complains of the refusal

of the judge to continue the case on account of the absence
of two witnesses by whom the accused alleged that he expected
to prove that they were acquainted with the general character
of the deceased, that such character was bad, and that from
their knowledge of it they would not believe him on oath.
Second, the ground which complains of the admission in evi-
dence of the following portion of the alleged dying declara-
tions of the deceased: "In October, 1896, myself and H. S.
Perry were walking up Decatur street in Atlanta, and he told
me he wanted to show me a girl he had on Collins street. We
went there. This was at night. Another time myself and
H. S. Perry went there; this was on Sunday afternoon, and
we went in the back way. On both of these occasions we went
to No. 11 Collins street, and Mr. Perry called for and saw Miss
Mamie Read, not an inmate of said house, but who came there
from Lithonia, Georgia, to meet said Perry, and stayed there
most of the time. So far as I know she was the only woman
Mr. Perry visited regularly." The objections made to the ad-
mission of this evidence were, that it was not proper subject-
matter of proof by dying declarations, was not in any way
part of the res gestæ, and did not tend to illustrate the man-
ner in which the deceased was killed.

The showing made on the application for a continuance
complied with the requirements of the law in such matters,
and a postponement of the trial should have been granted in
order to give the accused an opportunity to secure the attend-
ance of the witnesses. The mere fact that the witnesses lived
in a neighboring county (the railroad facilities between the
place of their residence and the place of the trial being such
as to bring the two places within easy communication of each
other) was not a sufficient reason for refusing to postpone the
case for a sufficient length of time to determine whether the
attendance of the witnesses could be secured.

The dying declarations of the deceased were introduced in
evidence by the State, and it is well settled that when such
evidence has been admitted it is allowable for the accused to
introduce evidence tending to impeach the declarant by proof
of general bad character, just as if he had been sworn as a

witness. These erroneous rulings of the judge were, in our opinion, calculated to prejudice the rights of the accused on the question of what punishment he should suffer. When a person is put upon his trial, charged with the offense of murder, the jury are called upon under the law of this State to decide two questions before a legal verdict of guilty can be rendered. Is the accused guilty or not guilty? If guilty, what punishment shall be inflicted? Shall he be punished capitally, or shall he be imprisoned in the penitentiary for the term of his natural life? It is well settled that no evidence which is not material on the main issue shall be allowed to go to the jury to be considered solely in determining the question of punishment, and that the only evidence which should go to the jury is such that is relevant and material to the main issue in the case, that is, the question of the guilt or innocence of the accused. They determine the first question according to the evidence which has been admitted and the law as given them in charge by the court. After having determined that question, the second question presented to them is, taking the case as made by the evidence upon which the finding of guilty is based, is the case of a character which requires capital punishment, or one in which life imprisonment would be proper. In determining the question of punishment the jury are not governed by any fixed rules. The decisions cited by Presiding Justice Lumpkin are sufficient in number and force to show that the settled law of this State is that the right of the jury to determine the punishment in a murder case is absolutely vested in them and not subject to be controlled either by the trial court or this court. While it is true that the jury should not determine this question capriciously but should have a due regard to the proper administration of the law and the interests of society, at the same time any attempt by the trial judge to hamper, control, or interfere with them in the determination of this question is improper and has often been held to be ground for a new trial. This being true, does it not clearly follow that if in the progress of the trial evidence which is calculated to prejudice the jury against the accused is improperly admitted, or evidence which might

probably have been considered by the jury in favor of the accused is wrongfully excluded, such errors should bring about the same result as if the judge had made an erroneous charge on the right of the jury to determine the question of punishment? The policy of the law of this State is that in the determination of this question the jury shall be left free and untrammeled. It can be assumed in this case, as in all cases where dying declarations are relied upon, that this evidence was urged upon the jury with great solemnity; and on account of its peculiar character and the surroundings under which it was given, jurors are prone to accept it as sufficient to establish the facts therein set up. If the dying declarations were credited by the jury, who is there that can say that that portion of them above set forth, which was improperly before the jury, was not of such a character as to prejudice the accused in the mind of every juror? If what is there said about the accused is true, his conduct is disgraceful and odious and calculated to array against him the just indignation of any one who is not lost to all sense of decency and propriety. If the evidence of the absent witnesses had been before the jury, and they had credited the testimony of such witnesses and believed that the deceased was a man of bad character and unworthy of credit, who can say that this circumstance, though slight in its nature, might not have been considered by the jury when they had under determination the question of the punishment to be inflicted? That there was positive evidence of the guilt of the accused outside of the dying declarations does not alter the case. The trial judge could not tell, and this court can not tell, whether the failure of the jury to recommend life imprisonment was based upon the dying declarations or upon the other testimony. If upon the dying declarations, and not upon the other testimony, who is there that can say that evidence of the bad character of the deceased would not have had some weight in the minds of the jury when they were about to determine what punishment was to be inflicted? We do not mean to say that the admission of the illegal evidence, or the refusal to allow the postponement to get testimony which would have been admitted if the witnesses had been present, would have had such an effect, but only that it

would, in our opinion, have been calculated to have some effect upon the minds of the jury when, after having determined that the accused was guilty, they were considering how he should be punished. We are frank to admit that the entire evidence in the case is of such a ·character as to satisfy almost any one that the accused was guilty of murder. Conceding this to be true, it is all the more reason why a new trial should be granted. The paradox apparently in this statement does not really exist, as will be shown. All that was left to the accused under the law was the privilege of asking the jury to punish him by imprisonment instead of by death. He had the same right to have this question fairly determined by the jury as he had to have the question of his guilt in that manner determined. The errors herein alluded to being, in our opinion, of a character calculated to influence the jury upon the question of punishment, they were such as required the granting of a new trial, in order that the jury might properly determine all of the questions which the law says should be determined solely by them. We are well aware of the fact that it is firmly established by the decisions of this court, both in civil and criminal cases, that where under the facts as they appear in the record no other verdict could be rendered under the law than that which appears in the record, a new trial will not be granted, although errors may have been committed during the progress of the trial. In other words, where the evidence in the case demands a certain verdict, that verdict will not be disturbed, notwithstanding errors may have been committed at the trial. This rule can have no application in a criminal case where the question of punishment is left absolutely to the discretion of the jury. It would properly be applied in those cases where the recommendation of the jury about the punishment is purely advisory, and the judge has the right to disregard it if he sees proper. But in a murder case, where the power to determine the punishment is vested absolutely in the jury, it can not be said that any state of facts would demand a verdict of guilty of murder without a recommendation. This court can not say that a jury were compelled by any evidence, no matter what its character, to find a general verdict of guilty in a murder case; and to say

that the evidence demands such a verdict is, in effect, the same as saying that the jury were compelled to bring in such finding. It therefore follows that any errors committed during the progress of the trial of a murder case, which were calculated to interfere with a fair determination by the jury of the question of punishment, would be ground for a new trial, notwithstanding that so much of the verdict as established the guilt of the accused might be said to be demanded by the evidence. The argument made by Presiding Justice Lumpkin in support of the verdict rendered in this case is strong and seems unanswerable; but the trouble is that it is addressed to those who under the law have no right to hear it. Such an argument, under the law of this State, can not properly be addressed to any other tribunal than the jury who tried the case. While what appears to the minds of all the members of the court to be the proper result in this case has been reached, that result has not been reached, in our opinion, in the way in which the law requires. It may be that a jury composed of men conscious of their obligations to society, and their duties under their oaths, would come to the conclusion that the interests of justice would be subserved by confining the accused in the penitentiary for life. It can make no difference whether they were influenced to that verdict by the evidence legally admitted, or were induced to that conclusion by the promptings of sympathy alone. The life of the accused was in their hands; and if they saw proper for any reason satisfactory to them to give it to him, no court has power to gainsay that exercise of that prerogative. And as the law vests in the jury the absolute power to determine this question without interference on the part of the court, when it appears in the record that anything has occurred which is calculated to interfere with a fair determination by the jury of this question, it is, in our opinion, the duty of this court to set aside the verdict and order a new trial, that the accused, if deprived of life, may suffer that punishment as the result of a trial had in conformity to law.

Except as above indicated, we concur in the rulings made by the majority of the court.