STATE OF IOWA, Appellee, v. O. H. SWEENEY, Appellant.

CRIMINAL LAW: Homicide—Optional Venues. A prosecution for murder by means of an attempted abortion may be prosecuted in the county wherein the resulting death occurred, even though the unlawful operation was performed in another county of this state.

HOMICIDE: Attempted Abortion—Use of Instruments—Sufficiency of Allegation. Indictment for murder by means of an attempted abortion reviewed, and held to adequately, though somewhat clumsily, allege the use by the accused of instruments as a means of effecting such abortion. (See Book of Anno., Vol. 1, Sec. 13743.)

INDICTMENT AND INFORMATION: Absence of Essential Allegations—Waiver. Objections that an indictment fails to allege the character of certain instruments or the manner of using them as a means of bringing about an abortion are waived by the failure to demur to the indictment.

ABORTION: Necessity—Opinion of Expert. A physician who has professionally attended a woman upon whom an abortion has been attempted, and who later performed an autopsy upon her body, may state whether, in his opinion, the abortion was necessary to save the life of the woman. Otherwise as to a physician who bases his opinion on matters not appearing in the record.

HOMICIDE: Evidence—Dying Declarations—Essential Limitations. Dying declarations must be limited to the *res gestae* of the crime and to the facts and circumstances immediately surrounding the same. Declarations reviewed, and held to violate this rule. (See Book of Anno., Vol. 1, Sec. 13897, Anno. 64 *et seq.*)

CRIMINAL LAW: Evidence—Irrelevant and Prejudicial Matter. In a prosecution for murder by means of an abortion, the State, after the admission, on motion of the accused, of a letter from the party committing the abortion, should not be permitted to show that, on the occasion of the writing of the letter, the writer thereof had registered at the hotel under an assumed name.

HOMICIDE: Evidence—Dying Declarations—Issue of Competency. The time elapsing between the making of alleged dying declarations and the death of the declarant may be very material on the issue whether the declarant was *in extremis*, and had no hope of recovery, at the time the declarations were made; and prejudicial error results from so instructing the jury as to deprive it of the right to consider said lapse of time on such issue.

**CRIMINAL LAW: Instructions—Reasonable Doubt—Unfortunate Attempt to Define.** It is unfortunate that some courts, in instructing juries as to the subject of a reasonable doubt, continue to employ the oft-condemned statement that "a doubt which entitles the defendant to acquittal must be reasonable, and not unreasonable."

Headnote 1: 16 C. J. pp. 192, 195. Headnote 2: 30 C. J. p. 103. Headnote 3: 31 C. J. pp. 822, 874. Headnote 4: 16 C. J. pp. 752, 753; 22 C. J. p. 640. Headnote 5: 30 C. J. p. 272. Headnote 6: 30 C. J. p. 272. Headnote 7: 30 C. J. pp. 255, 338. Headnote 8: 16 C. J. p. 990.

Headnote 1: 13 R. C. L. 882. Headnote 2: 1 R. C. L. 81. Headnote 3: 1 R. C. L. 81. Headnote 4: 1 R. C. L. 87. Headnote 5: 56 L. R. A. 369; 1 R. C. L. 534. Headnote 7: 56 L. R. A. 421; 1 L. R. A. (N. S.) 419; 1 R. C. L. 537.

*Appeal from Black Hawk District Court.*—GEORGE W. WOOD, Judge.

NOVEMBER 16, 1926.

OPINION ON REHEARING JULY 1, 1927.

Defendant was indicted for murder in the second degree, growing out of an abortion. From a verdict of guilty he appeals.—*Reversed.*

*J. C. Murtagh* and *Mears & Lovejoy,* for appellant.

*Ben J. Gibson,* Attorney-general, *F. W. Edwards,* Special Prosecutor, and *William A. Cook,* County Attorney, for appellee.

ALBERT, J.—A rehearing having been granted in this case, the original opinion filed (210 N. W. 804) is withdrawn.

The first question presented for our consideration is the question of venue. The indictment alleges that Mrs. Bertha Munger, the woman for whose death the defendant is sought to be held responsible, was a resident of Waterloo, Iowa; that the abortion charged occurred in Polk County, in the city of Des Moines, on or about the 25th day of August, 1924, and was performed by one Dr. Ada Fuller; that, after the operation, Mrs. Munger returned to Waterloo, in Black Hawk County, where she died on the 7th day of September following. It is very seriously contended that,

1. CRIMINAL LAW: homicide: optional venues.

under these circumstances, the district court of Black Hawk County had no jurisdiction to put the defendant on trial, because the crime, if any, was committed in Polk County, and not in Black Hawk County.

Section 13451, Code of 1924, reads as follows:

"When a public offense is committed partly in one county and partly in another, or when the acts or effects constituting or requisite to the consummation of the offense occur in two or more counties, jurisdiction is in either county, except as otherwise provided by law."

The storm center of this contention is in the interpretation of this section of the statute.

Chapter 47, Section 42, of the Revised Statutes of the Territory of Iowa, 1843, reads as follows:

"Where a criminal act has been committed in one county, and the crime consummated in another (as where the mortal blow was given in one county, and the death took place in another), the offender may be indicted in either county."

Under this section of the statute, which became the law of the state of Iowa on its admission to the Union, in December, 1846, one case was decided, *Nash v. State,* 2 G. Greene 286. The defendant in that case was indicted for murder, occurring on a steamboat on the Mississippi River, within the jurisdiction of Scott County. The victim was carried on the boat to Muscatine County, where he died. An indictment was returned against the defendant, and he was placed on trial in Muscatine County. The conclusion reached in that case, after the above cited statute had been quoted, was:

"The application of this act to the case at bar is too obvious to allow of any discussion. 'The mortal blow was given' in Scott County, 'and the death took place in' the adjoining county of Muscatine. The statute, therefore, conferred jurisdiction of the case on Muscatine County."

In the Code of 1851, the above-quoted section of the 1843 Code was amended, and in lieu thereof was enacted the following:

"Section 2806: When a public offense is committed in part in one county and in part within another, or when the acts or effects constituting or requisite to the consummation of the of-

fense occur in two or more counties, jurisdiction is in either county.''

This section was re-adopted in the Code of 1873, as Section 4159, and in the Code of 1897, as Section 5157, except that there was added at the close of said section the words ''except as otherwise provided by law;'' and the above section, Code of 1924 (Section 13451), is identical with this section as it appears in the Code of 1897. Under these sections, our decisions are not very numerous. Following the *Nash* case, the next decision in which this section is touched is *State v. Hollenbeck*, 36 Iowa 112. In that case the defendant was indicted under Section 4221, Revision of 1860, which reads as follows:

''That every person who shall willfully administer to any pregnant woman any medicine, drug, substance or things whatever, or shall use or employ any instrument or other means whatever, with the intent thereby to procure the miscarriage of any such woman, unless the same shall be necessary to preserve the life of such woman, shall upon conviction thereof be punished * * *''

The indictment in that case was found in Calhoun County. It alleged that the drugs or other substance were administered in Carroll County, but that the miscarriage actually occurred in Calhoun County. The court there said:

''The offense defined by this statute consists in willfully administering the medicine, etc., with the intent to procure miscarriage. When the medicine is administered with that intent, the offense is complete, regardless of the result. If death ensue, the party may be guilty of murder or other crime, but that question is not involved in this case. The offense charged in this indictment being completed by administering the medicine, with the intent specified in Carroll County, it follows that the district court of Calhoun County had no jurisdiction of the offense.''

That the *Hollenbeck* case has no application to the case at bar is too apparent to need discussion. Later, we had occasion to touch upon this question in the case of *State v. Standard Oil Co.*, 150 Iowa 46, where this company was indicted for unlawfully, intentionally, and for the purpose of destroying the business of a competitor and creating a monopoly, discriminating between different communities, to wit, the town of Alton in the county of Sioux in said state, and the town of Doon in the

county of Lyon in said state, by charging a lower rate for the same grade of gasoline in the town of Alton than in the town of Doon, etc. The indictment was returned in Lyon County, and it was held that, if the indictment charged any crime, it was a crime committed in Sioux County, and no prosecution could be had therefor in the county of Lyon. We there said:

"The offense is not one punishable in one of two or more counties, at the election of the prosecution. It was not complete until the defendant sold at a lower rate in one community than the rate charged in another, and, when the unlawful act of selling at a lower rate was committed, then the crime was complete."

The point in that case was that the indictment charged the selling at a lower rate in Sioux County; hence the holding that no prosecution could be had in Lyon County.

These cases seem to be the sum total of our expressions with reference to this section of the statute. The question generally is quite elaborately treated in 16 Corpus Juris 195, but, as usual under such circumstances, few states have statutes similar to ours; hence, on an interpretation of the statute, many decisions cited in the notes to the above section of Corpus Juris are of little value.

The point most seriously urged by appellant is that this section of the statute has no application to the case at bar, because the crime was complete by the abortion in Polk County, and the death of the woman was only an incident thereto. The trouble with this argument is that the defendant is not being tried for an attempted abortion, under Section 12973, Code of 1924, which provides a penalty for such attempted abortion, but is here charged with murder in the second degree.

The Indiana Supreme Court had occasion to pass upon this question in *Hauk v. State,* 148 Ind. 238 (46 N. E. 127), under a venue statute which, in wording, is identical with the Iowa statute. In the Indiana abortion statute, miscarriage or death of the woman is made a necessary element. In this it differs from the Iowa statute. In other words, under the Indiana abortion statute, if the woman did not miscarry or die, the statute did not apply. That is, miscarriage or death was a necessary element, under the statute. In this respect the *Hauk* case differs from the Iowa statute. The indictment was returned in Montgomery

County, Indiana, where defendant was placed on trial. The abortion was committed in Fountain County, and the woman miscarried and died in Montgomery County, and it was urged that Montgomery County had no jurisdiction. The court said of this situation, quoting from *Archer v. State*, 106 Ind. 426 (7 N. E. 225):

"Where the crime is composed of several elements, and a material one exists in either one of two counties, the courts of either county may, under our statute, rightfully take jurisdiction of the entire crime."

The charge in the case at bar is not an attempted abortion, but a charge of murder in the second degree, resulting from an attempted abortion. If this woman had not died, the only indictment that could have been returned against the defendant would have been attempted abortion, and, of necessity, such an indictment should be returned in Polk County. But under a charge of murder in the second degree, the death of the woman is a necessary element of such charge; and where, as in this case, part of the elements of the crime occur in one county and part in another, under the aforesaid section of our statute, we hold that the jurisdiction is in either county.

A further view of this same proposition is apparent from an analysis of the section quoted, Section 13451, Code of 1924. Under the first part of this section, where a defendant did certain things in one county and certain things in another,—in other words, where part of his acts are in one county and part in another,—then the jurisdiction is in either county. Under the latter part of the section, where the acts or effects constituting or requisite to the consummation of the offense occurred in two or more counties, the jurisdiction is in either county. While it must be frankly confessed that this statute is somewhat ambiguous, we think the purpose of the legislature was to provide that, where part of the elements of the offense occurred in one county, and part in another, the jurisdiction is in either county; and, as the death of this woman was a necessary element of the crime charged, the court did not err in holding that the jurisdiction was in Black Hawk County.

The indictment in this case reads as follows:

"The grand jury of the county of Black Hawk, in the name and by the authority of the state of Iowa, accuses O. H.

Sweeney of the crime of murder in the second degree, committed 2. HOMICIDE: attempted abortion: use of instruments: sufficiency of allegation. as follows: The said O. H. Sweeney, on or about the 25th day of August, in the year of our Lord, one thousand nine hundred and twenty-four, in the county of Polk and state of Iowa aforesaid, did, willfully, unlawfully, feloniously, and with malice aforethought, administer to one Mrs. Bertha Munger, she being then and there a pregnant woman, some drug, medicine, and substance, the exact nature and character of which is to the grand jury unknown, and did then and there unlawfully, feloniously, and with malice aforethought, with certain instruments, the name and particular description of which are to the grand jury unknown, with intent then and there to unlawfully produce a miscarriage on the person of her, the said Mrs. Bertha Munger; said miscarriage not being necessary to save the life of the said Mrs. Bertha Munger. That the said defendant, in the manner aforesaid, in Polk County, Iowa, on or about the 25th day of August, 1924, by and with the use of said drugs and substance and the use of said instruments aforesaid, did, willfully, unlawfully, feloniously, and with malice aforethought, produce a miscarriage on the body and person of the said Mrs. Bertha Munger, which miscarriage was not necessary to save the life of the said Mrs. Bertha Munger. That defendant, by said miscarriage, did, on or about the 7th day of September, 1924, in Black Hawk County, state of Iowa, cause the death of the said Mrs. Bertha Munger, and the said defendant did then and there, in the manner aforesaid, by causing said miscarriage, willfully, feloniously, maliciously, deliberately, and with malice aforethought, kill and murder the said Mrs. Bertha Munger, contrary to the statute in such cases made and provided, and against the peace and dignity of the state of Iowa.''

It is insisted that, under this indictment, the defendant could not be put upon trial for a charge of attempted abortion on this woman by the use of instruments, because there is no allegation therein charging that any instruments were used on Mrs. Munger. With this contention we cannot agree. The indictment is by no means well drawn, yet in our opinion it does contain sufficient allegations, although in a somewhat disconnected way, to warrant the court in submitting to the jury the question of attempted abortion by the use of instruments. The appellant

quotes only the first part of the indictment, and says that it only charges an attempted abortion by the use of drugs; but, if the indictment were divided in this way, it would not be a good charge, even for an attempted abortion by the use of drugs, because it does not contain the necessary allegations therefor. It continues:

"And did then and there, unlawfully, feloniously, and with malice aforethought, with certain instruments, the name and particular description of which are to the grand jury unknown, with intent then and there to unlawfully produce a miscarriage on the person of her, the said Mrs. Bertha Munger; said miscarriage not being necessary to save the life of the said Mrs. Bertha Munger."

It will be noted that the words "certain instruments" herein are used in a disconnected and uncertain way, but the indictment continues:

"That the said defendant, in the manner aforesaid * * * by and with the use of said drugs and substance and the use of said instruments aforesaid, did, willfully, unlawfully, feloniously, and with malice aforethought, produce a miscarriage on the body and person of the said Mrs. Bertha Munger," etc.

We think this is a sufficient allegation as to the use of instruments on the person of Mrs. Munger to fill the requirements of such allegations in the indictment; and while, as said, the indictment is poorly drawn, at the same time we hold it to be sufficient.

Further question is raised about the sufficiency of this indictment, and the claim is that there is no showing of the manner and use of the instruments, and that there is no allegation that the instruments were used on the person or body of Bertha Munger, or as to the character of the instruments. If there be any merit in this contention, it was waived by failure to demur to the indictment. *State v. Gulliver,* 163 Iowa 123; *State v. Gregory,* 198 Iowa 316; *State v. Costello,* 200 Iowa 313.

3. INDICTMENT AND INFORMATION: absence of essential allegations: waiver.

One Dr. McAlvin, who was called in consultation with a Dr. Stevenson, went to the home of the deceased, at the solicitation of a sister, and found Mrs. Munger in precarious condition,

suffering from blood poisoning. They had a short conversation with her, and took her to the hospital, where she died, several days later.

4. ABORTION: ne-
cessity: opin-
ion of expert.

After her death, a post mortem was held, in which these two doctors participated. Dr. Stevenson says that he had not seen the deceased for several months prior to the time he was called in consultation, and Dr. McAlvin testified that he had never seen Mrs. Munger prior to the time he went to this consultation. With this as a basis (or lack of basis), each of these physicians was asked to give his opinion as to whether or not this abortion was necessary, to save the life of the deceased. This question was objected to, on the ground that the physicians' testimony did not show the proper foundation for an opinion. We think the court's ruling was right. However, Dr. McAlvin, in answer to the question, testified:

"I would not say it was not necessary, from the history of the case, to save her life."

It is apparent, therefore, that he is attempting to base his opinion on what he calls "the history of the case," and not upon what he discovered on the post-mortem examination. There is nothing to show from whom he received the history of the case. We are, therefore, of the opinion that his answer should not have been permitted to stand.

Certain dying declarations purporting to have been made by Mrs. Munger were received in evidence, and objections were made thereto. The rule admitting dying declarations has received approval by this court, and may be generally stated as follows: In a prosecution for homicide, the declarations of the deceased, voluntarily made, while *in articulo. mortis,* and under solemn conviction of approaching dissolution, concerning the facts and circumstances constituting the *res gestae* of his destruction, where the deceased would be a competent witness if living, are always admissible in evidence. This is the rule as stated in 30 Corpus Juris 251, and has the support of this court in the cases of *State v. Elliott,* 45 Iowa 486; *State v. Dyer,* 147 Iowa 217; *State v. Luther,* 150 Iowa 158; *State v. Brumo,* 153 Iowa 7; *State v. Klute,* 160 Iowa 170. Objections made to these declarations in the instant case are on the grounds that they were not voluntarily made, and that deceased was not *in articulo*

5. HOMICIDE: evi-
dence: dying
declarations:
essential limi-
tations.

*mortis* and under solemn conviction of approaching dissolution. The further objection urged upon our attention is that the alleged dying declarations contained certain statements and facts which were in no way connected with the *res gestae* of her destruction.

Certain declarations were made at her home, before she was taken to the hospital, and some of these were again made to some of the same parties at the hospital. That the two sets of declarations should not have been permitted in evidence is urged. This question is disposed of in the cases of *State v. Tweedy,* 11 Iowa 350, at 359, and *State v. Walton,* 92 Iowa 455. In the latter case, this court said:

"There was a written declaration and verbal declarations made at different times. They were all admissible. 'The prosecutor in a murder case cannot be confined to proving dying declarations made at one time, if there were others made at other times. All are competent. Nor can he be confined to proving what was said at one time, when the statement was reduced to writing and signed at another.' 6 Am. and Eng. Encyclopedia of Law 131."

It further appears that, after Mrs. Munger was taken to the hospital, her statements were taken down in writing, and, after they had been read to her, she approved and signed the same. Among the declarations made at the home of which complaint is made are, as shown by the evidence of Dr. Stevenson, the following:

"Mrs. Munger stated that she was ashamed of what she had done; that Howard Sweeney was paying her bills, and took charge of her property; that I [the doctor] knew she had no one to look to, since Mr. Munger's death, and that she believed him when he said he would marry her; that she had nothing to do with the calling of the physician, or she would have called me; that Mr. Sweeney called the physician; that she was about three months pregnant, or had been about three months pregnant, and that Mr. Sweeney took her to Des Moines, for the purpose of having an abortion procured; that Dr. Ada Fuller had done the work, and hurt her terribly, since which time she had been sick, gradually growing worse,—was nauseated, and had abdominal pains; and that, on Thursday, I think it was,—which was after her return from Des Moines,—Dr. McCall was called, and he,

with the assistance of Mr. Sweeney and a Mrs. O'Rourke, had made a curettement, without anæsthesia,—that is, without giving an anæsthetic. She said that Mr. Sweeney had had intercourse with her, and that, as a result of that, she had become pregnant; that he had promised to marry her; and that she had believed him."

Dr. J. G. McAlvin, who was present at the time referred to by Dr. Stevenson, with reference to the same conversation and statements said:

"Previously she said that Howard Sweeney had promised to marry her, but refused to do it, and that she had accompanied him to Des Moines, to have an abortion, because of this. She said that Dr. Fuller used instruments, and was very rough, and hurt her terribly."

To each and all of the questions to which the above matters were recited by the witnesses, due and timely objections were made, and later, motion was made to strike the same.

While considering this matter, we must not lose sight of the exact situation of the defendant in this case. While, of course, he is charged as a principal, under the indictment herein, in pursuance of the permission under the statutes of this state, at the same time there is no claim made that he is the party who performed the operation upon this woman. The claim of the State, if we understand it rightly, is that he was an accessory before the fact. In the light of this situation, the question is whether or not the above statements, which are introduced as dying declarations, are admissible.

Among the statements above set out, however, there are some that obviously should not have been admitted, among which are: "She said she had nothing to do with the calling of the physician, or she would have called me;" also the statement that she said she "was ashamed of what she had done;" and "I knew she had no one to look to since Mr. Munger's death;" that Howard Sweeney was paying her bills, and took charge of her property; and Dr. McAlvin's statement that previously she had said Howard Sweeney had promised to marry her, but refused to do it. It was error for the court to admit the above statements, as they do not come within the rule of dying declarations.

After Mrs. Munger was taken to the hospital, she was informed that she was dying, and was asked if she appreciated the

fact, and she said she did. Thereupon, the written statement was made. It reads as follows:

"Bertha Munger: 'I am 36 years old, and have lived in Waterloo all my life. I know Howard Sweeney, and he has been calling at my house for the past six months. All my accounts are charged to him. He promised to marry me several times, and we had sexual intercourse several times, at different places. By reason of having sexual intercourse, I became pregnant. My usual monthly sick period has not occurred for the past three months. He sent me to Des Moines, Iowa,—went with me to that city, to have this done. I told Sweeney I wouldn't pay any doctor bills, and he told me to charge it to him. He took me to this doctor, whose name is Dr. Ada Fuller, on a Monday in the latter part of August, the operation took place. Came back to Waterloo the following Wednesday. On August 29th, Dr. McCall was called in, to assist in the case. [Signed] Bertha Munger.' ''

It is to be remembered that dying declarations are, at most, purely hearsay testimony, and the rule permitting their introduction as evidence is an exception to the general rule governing hearsay testimony. The question is, What matters may properly be included in a dying declaration?

In *State v. Perigo*, 80 Iowa 37, this court had this question under consideration. We there said:

"Dying declarations are statements of material facts concerning the cause and circumstances of homicide made by the victim, under solemn belief of impending death. They are restricted to the act of killing, and to the circumstances immediately attending it, and forming a part of the *res gestae*. When they relate to former and distinct transactions, and embrace facts or circumstances not immediately illustrating or connected with the declarant's death, they are inadmissible. They are admissible only as to those things to which the deceased would have been competent to testify. They must relate to facts, and not to mere matters of opinion or belief.''

The homicide committed in the *Perigo* case grew out of some transactions between the parties about certain cattle, and the witness reciting the dying declarations was permitted to testify that, as a part of the same, the deceased made a statement in relation to threats that had been made against him by the

defendant prior to the time of the shooting, and did not give the dates. With reference to this, the court said:

"The threats were not made at the time of the homicide, but prior thereto. How long prior, was not stated; but it appears from other testimony that the quarrel about the cattle had occurred between that time and the day of the homicide. Surely, these threats were not a statement of anything forming a part of the *res gestae,* but of a former and distinct transaction. 'The rule that dying declarations should point distinctly to the cause of death, and to the circumstances preceding and attending it, is one that should not be relaxed. Declarations, at the best, are uncertain evidence, liable to be misunderstood, imperfectly remembered, and incorrectly related. As to dying declarations, there can be no cross-examination. The condition of the declarant in his extremity is often unfavorable to clear recollection, and to the giving of a full and complete account of all the particulars which it might be important to know. Hence all vague and indefinite expressions, all language that does not distinctly point to the cause of death and its attending circumstances, but requires to be aided by inference or supposition in order to establish facts tending to criminate the respondent, should be held inadmissible.' ' "

Later, in the case of *State v. McKnight,* 119 Iowa 79, the court said:

"One or more of the witnesses to the dying declarations were permitted to testify that the deceased, after stating the particulars of the alleged assault, further said, in substance, that he had assaulted her on a former occasion, and she was not yet well from the hurt then inflicted upon her by defendant. It is argued that the law which permits the use of dying declarations in evidence limits them strictly to the facts and circumstances attending the immediate injury from which the declarant is about to die, and that statements as to prior occurrences are inadmissible. This, we think, is a correct statement of the law."

*State v. Johns,* 152 Iowa 383, relied upon by the State, throws no light upon this matter.

In *Perry v. State,* 102 Ga. 365 (30 S. E. 903), the defendant was accused of homicide, which he claimed to justify on the ground that the deceased had committed rape on the wife of the defendant. A dying declaration was admitted in evidence,

under a general statute permitting the introduction of dying declarations, reciting facts some of which occurred long prior to the homicide, and also a denial on the part of the deceased of any improper relations with Mrs. Perry, and a denial that he had gone with her at a previous time to a house, for improper purposes. In passing upon this matter, the court said:

"It is clear that some, if not all, of the evidence above referred to should have been rejected. The purposes for which dying declarations may be introduced are, under the section of our Code just cited, and the general and well-settled rules of law applicable, limited; and accordingly such declarations are not admissible to prove events occurring any considerable period before the homicide, or which are not directly connected with its perpetration."

In *State v. O'Shea,* 60 Kan. 772 (57 Pac. 970), the court said, with reference to this question:

"It is limited to cases of homicide, and is confined to the act of killing and the circumstances immediately attending the act which form a part of the *res gestae.* Statements relating to former and distinct transactions, and embracing facts and circumstances not immediately connected with the killing, cannot be received. Mere conclusions, opinions, and beliefs, which would not be received if the declarant were a witness, are not admissible."

In *Foley v. State,* 11 Wyo. 464, 485 (72 Pac. 627), it is said:

"Dying declarations are obnoxious to the objections which, according to the general rule, exclude hearsay testimony * * *. But, in view of the fact that in many cases there are no eyewitnesses to the murder except the slayer and the deceased, they are made an exception to the rule, and admitted upon the ground of necessity. But the exception only extends to cases of homicide, 'where the death of the deceased is the subject of the charge and the circumstances of the death are the subject of the dying declarations.' (1 Greenl. Ev. §156.) If they relate to former distinct matters, they do not come within the reason of the exception, and are not admitted. * * * [Citing cases, among which are *Hackett v. People,* 54 Barb. (N. Y.) 370, 374.] In *Hackett v. People,* supra, one of the declarations was that the defendant had often threatened to kill the deceased. It was held to have been erroneously admitted, and the judgment was

reversed upon that ground. In this case the dying declarations of deceased that he and defendant had had frequent quarrels, and that defendant had, in effect, challenged him to fight with pistols, some days before the transaction which resulted in the killing, were clearly inadmissible, and, as they strongly tended to show malice and a motive for the killing, we cannot very well see how the error could fail to prejudice the defendant's case."

In *State v. Moody,* 18 Wash. 165, 175 (51 Pac. 356), the dying declarations contained the following question: " 'Had he ever threatened before to injure you?' and the answer was 'Yes.' " The court said:

"We think it may be conceded, without a citation of authorities, that prior threats are no part of the dying declaration; that they are no part of the *res gestae,* and therefore cannot be admitted as a dying declaration of a deceased person. The universal rule is that the dying declarations are restricted to the act of killing and the circumstances directly preceding it and forming a part of the *res gestae.*" (Citing *State v. Wood,* 53 Vt. 560.)

It was there held that the admission of this part of the dying declaration was prejudicial error.

The Missouri court announced the rule, in *State v. Parker,* 172 Mo. 191, 202 (72 S. W. 650, at 653), as follows:

"Dying declarations are admissible as to those facts and circumstances constituting the *res gestae* of the homicide, but as to all other matters occurring anterior to the killing, and not immediately connected with it, they are incompetent. This is the settled law of this state." (Citing authorities.)

In *State v. Baldwin,* 79 Iowa 714, 720, this court had before it a case very similar to the case at bar, in which it was charged that the defendant was guilty of the homicide of Mattie Rodebaugh, by reason of an attempted abortion on her. With reference to her dying declarations it is said:

"Dying declarations are statements of material facts concerning the cause and circumstances of homicide, made by the victim under a solemn belief of impending death. They are restricted to the act of killing, and to the circumstances immediately attending it, and form a part of the *res gestae.* When they relate to former and distinct transactions, and embrace facts or circumstances not immediately connected with the declarant's

death, they are inadmissible. * * * There is no question but that the declarations relied upon were spoken with reference to the defendant. They are as follows: 'He is the cause of my death. Oh, those horrible instruments! Laws is the cause of my death; he is my murderer. They abused me terribly.' * * * These declarations did not necessarily refer to any attempt to produce an abortion. They are as plainly referable to the former relations of the parties. If it be true that the defendant had gotten the deceased with child, then her declarations were such as she might naturally make in her extremity, about her seducer, without intending to charge him with any more than her seduction. The expression 'Oh, those horrible instruments!' may indicate that instruments were used, but in no wise charges the defendant with having used them or aided in their use. We have seen that dying declarations must relate to facts, and not to mere expressions of opinion or belief. It has been held that, where a person dying from a gunshot declares that 'A. shot me. A. killed me. A. is my murderer,'—would be admissible as the statement of a fact, because of the circumstances. To say, under such circumstances, 'A. is my murderer,' would not be an expression of an opinion with respect to the degree of the homicide, but a statement of the fact that A. had inflicted the mortal wound. Not so, however, with these declarations. They cannot be considered as stating as a fact that defendant had anything to do with attempting to or producing an abortion. 'The rule that dying declarations should point distinctly to the cause of death, and to the circumstances producing and attending it, is one that should not be relaxed. Declarations at the best are uncertain evidence, liable to be misunderstood, imperfectly remembered, and incorrectly stated. As to dying declarations there can be no cross-examination. The condition of the declarant in his extremity is often unfavorable to clear recollection, and to the giving of a full and complete account of all the particulars which it might be important to know. Hence, all vague and indefinite expressions, all language that does not distinctly point to the cause of death and its attending circumstances, but requires to be aided by inference or supposition, in order to establish facts tending to criminate the respondent, should be held inadmissible.' *State v. Center,* 35 Vt. 378. Our conclusion is

that the court erred in admitting these declarations, and that such ruling was prejudicial to the defendant.''

Under the rules announced in the above line of authority, both in this state and elsewhere, the question, we think, is whether or not any part of the oral or written dying declarations introduced in this case is subject to objection. Under the rule, we are limited to the *res gestae* of the crime and the facts and circumstances immediately surrounding the same. The difficult question is to say just where the line is, back of which previous relations are not admissible because not part of the *res gestae* of the crime.

Turning now to the declaration signed by Bertha Munger, we hold that certain statements therein contained are not admissible, and parts thereof should be stricken, and after they are so stricken, it should read as follows:

''Bertha Munger: 'I am 36 years old, and have lived in Waterloo all my life. I know Howard Sweeney. He sent me to Des Moines, Iowa,—went with me to that city, to have this done. He took me to the doctor, whose name was Dr. Ada Fuller, on Monday in the latter part of August, the operation took place. Another girl was there, helping Dr. Fuller perform the operation. Went back to Waterloo the following Wednesday.' ''

We are of the opinion that, under the rule, the above statements in the dying declaration were admissible. *State v. Brooks,* 192 Iowa 1107.

The same rule should be applied to the oral declarations testified to by Dr. Stevenson and Dr. McAlvin. In short, the facts of her sexual intercourse and pregnancy, brought about by Sweeney, his accompanying her to Des Moines, her recitation of the facts as to what took place there and his part therein, and his accompanying her home to Waterloo, are all proper subjects of a dying declaration; and occurrences antedating these matters are not admissible. We are of the opinion that the foundation necessary to admit these dying declarations was properly laid, and that the requirements of the law as to her realization that the end was near and that she had no hope for recovery were sufficiently fulfilled.

It seems from the evidence that Dr. Ada Fuller went to Waterloo, after the death of Mrs. Munger, and there wrote a letter to Sweeney's attorney, which was introduced in evidence

6. CRIMINAL LAW:
evidence: ir-
relevant and
prejudicial
matter.

by the defendant. It appears further from the evidence that, when she went to Waterloo, she registered at a hotel under a fictitious name, and checked out at one time, and re-registered the same day. These facts were introduced by the State, over the objection of the defendant, through a witness by the name of Nye, who was connected with the hotel. The letter in question was written on the stationery of the hotel at which she stopped. The defendant having introduced the letter in evidence, we think it was competent for the State to show any fact connected with or surrounding the writing of this letter; but the testimony introduced by this witness does not go to the question of the writing of the letter or the immediate facts surrounding it. This testimony was highly prejudicial to the defendant, and should not have been admitted.

The defendant asked two instructions covering the question of the weight and value of dying declarations, which were refused by the court. Defendant was entitled to have this subject covered in an instruction; and equally so, the instruction asked, covering circumstantial evidence, should have been given.

The fifteenth instruction is to the effect that:

"The fact that Bertha Munger lived several days after she made the statements which have been admitted in evidence as her dying declarations does not change the character of her statements, or affect your right to consider them as being declarations, in determining the guilt or innocence of the defendant, if the said Bertha Munger, at the time such declarations were made by her, believed that she was about to die, and that such declarations were made by her under a solemn sense of impending death."

7. HOMICIDE: evi-
dence: dying
declarations:
issue of com-
petency.

In *Mattox v. United States*, 146 U. S. 140 (36 L. Ed. 917), it is held that the length of time elapsing between the making of the declaration and the death is one of the elements that may be taken into consideration by the jury in determining whether she was *in extremis*, and had no hopes of recovery. In the instant case, the instruction given takes away the force and effect of the rule above announced.

The county attorney, in cross-examining one of the witnesses, asked her if she did not know, as a matter of fact, that

Dr. Ada Fuller, who is claimed to have actually produced the alleged abortion, had been convicted in the district court of Polk County under a charge of abortion. The objection was properly sustained, and the witness not permitted to answer.

The court gave the following instruction:

"A reasonable doubt is such a doubt as fairly and naturally arises in your minds after fully and carefully weighing and considering all of the evidence introduced, as well as the want of evidence in the case, when viewed in the light of all of the facts and circumstances; but a doubt which entitles the defendant to an acquittal must be reasonable, and not unreasonable. It must be real, not captious or imaginary, or arising from sympathy; and it must be a doubt which, without being sought after, fairly and naturally arises in the mind, from a careful consideration of all of the evidence introduced in the case, or the want of evidence, when viewed in the light of all the circumstances."

8. CRIMINAL LAW: instructions: reasonable doubt: unfortunate attempt to define.

It will be noted that this instruction contains a phrase repeatedly condemned by this court, to wit, "but a doubt which entitles the defendant to acquittal must be reasonable, and not unreasonable." We have consistently and persistently called the attention of the courts to the use of this phrase since the case of *State v. Phillips,* 118 Iowa 660, where we condemned the same, and also in the following cases: *State v. McCausland,* 137 Iowa 354; *State v. Smith,* 194 Iowa 639; *State v. Comer,* 198 Iowa 740; and *State v. Sipes,* 202 Iowa 173. Some courts have failed to heed these warnings.

On a retrial of this case, the aforesaid portion of the instruction on reasonable doubt should be omitted.

Some other matters are discussed, but, as they are not likely to arise on a retrial, we give them no further attention.—*Reversed.*

All the justices concur, except DE GRAFF, J., who takes no part.