Maureen M. BRATTON, as Executor of
the Estate of Clayton Gene Bratton and
as an Individual; Clayton G. Bratton;
and David M. Bratton, Appellants,

v.

Lowell D. BOND, Appellee.

No. 85–1512.

Supreme Court of Iowa.

June 17, 1987.

Robert W. Goodwin, Ames, and Mark D. Ravreby, Des Moines, for appellants.

Chester C. Woodburn, III of Hansen, McClintock & Riley, Des Moines, for appellee.

Considered by REYNOLDSON, C.J., and McGIVERIN, WOLLE, LAVORATO and NEUMAN, JJ.

McGIVERIN, Justice.

Plaintiffs Maureen Bratton, both individually and as the executor of the estate of her husband Clayton Gene Bratton (Gene), Clayton G. Bratton, and David Bratton appeal from judgment entered on an adverse jury verdict in their medical negligence action against defendant-doctor Lowell Bond. In seeking a new trial, plaintiffs contend a ruling on a jury instruction by the trial court was erroneous. They also assert that the court abused its discretion in ruling on certain evidentiary matters and in limiting the testimony of one of plaintiffs' expert witnesses. We disagree with plaintiffs' contentions and affirm the judgment.

I. *Background facts and proceedings.* From the evidence adduced at trial, the jury could have found the following facts. In 1976 Gene Bratton experienced pains in his chest that radiated to his arms. He sought diagnosis and treatment of his condition from Dr. Lowell Bond, a general practitioner. Dr. Bond ran an electrocardiogram (EKG) on Gene. The results of the EKG were normal and consistent with the results of another EKG conducted on Gene by Dr. Bond in 1973. Dr. Bond diagnosed the condition as a hiatal hernia or angina, a term that he asserts is synonymous with coronary vascular disease. He placed Gene on medication for the hiatal hernia and monitored the chest pains through frequent office visits with Gene. Dr. Bond also encouraged Gene to lose weight and quit smoking. Gene did not report any further pain or heart problems until 1978.

Gene visited Dr. Bond in early 1978 and again reported occasional heart pain. At that time Dr. Bond did another EKG and discovered abnormalities including extra heart beats. The doctor prescribed medication for Gene's irregular heart rate and continued the prescription drug for treatment of hiatal hernia.

Dr. Bond changed the type of heart medication prescribed for Gene's condition in response to continued occasional heart pain experienced in mid–1978.

From May 1978 to July 1982 Gene did not report any heart pain to Dr. Bond. Dr. Bond tapered Gene off the heart medication in the spring of 1981 with no apparent ill effects.

On July 12, 1982, Dr. Bond examined Gene in the doctor's office and formed an impression that Gene had congestive heart failure. Dr. Bond recommended that Gene check into a local hospital for testing. Following Gene's hospitalization that day, Dr.

Bond stabilized Gene's condition and recommended he visit a cardiologist for further evaluation.

In September of 1982, Dr. David Lemon admitted Gene to a Des Moines hospital for cardiological tests. Dr. Lemon diagnosed Gene's condition as "severe ischemic cardiomyopathy with inoperable coronary disease." Gene died two days after his dismissal from the hospital. The autopsy revealed that he suffered from triple vessel disease which blocked three of his coronary arteries.

Brattons, Gene's estate, wife and sons, filed this action against Dr. Bond alleging he was negligent in failing to diagnose and properly treat Gene's heart condition. Dr. Bond defended his actions by stating that he diagnosed Gene's heart condition in 1978 and treated that condition with medication. He further asserted that Gene was aware of this course of treatment and accepted it over surgical treatment of the condition. Following trial on the merits, the jury returned a verdict in favor of Dr. Bond and the trial court entered judgment in Bond's favor.

Plaintiffs appeal from this judgment challenging three adverse rulings by the trial court. First, plaintiffs argue the court abused its discretion in limiting the trial testimony of Dr. Lawrence Staples, one of plaintiffs' experts. Second, plaintiffs assert that the court erred by instructing the jury that a physician does not make any implied guarantee of results. Finally, plaintiffs contend the court abused its discretion by excluding from evidence as inadmissible hearsay a letter that Gene Bratton was writing to his brother during the two days preceding his death.

II. *Limiting the testimony of an expert witness.* Plaintiffs claim the trial court abused its discretion in limiting the testimony of Dr. Lawrence Staples on the ground that some of his proposed testimony was not disclosed during discovery.

During trial Dr. Staples was asked by plaintiffs' counsel, "If a patient had, say, triple vessel disease, what we have talked about, would his longevity be improved with the use of coronary bypass surgery?"

Counsel for Dr. Bond interposed an objection to that question and similar questions because counsel had not been alerted to the fact that Dr. Staples would testify regarding longevity and improved quality of life had other medical procedures been used in diagnosing and treating Gene Bratton.

Iowa Rule of Civil Procedure 122(d) states that experts who are expected to testify at trial are to be identified, the subject matter of their testimony disclosed and a summary of their opinion given in response to interrogatories in connection therewith by the adverse party. It is apparent that Dr. Staples was not listed in plaintiffs' initial response to Dr. Bond's written interrogatories concerning any experts to be used by plaintiffs as witnesses at trial.

Iowa Rule of Civil Procedure 125(a)(2) recites a party's duty to supplement answers to interrogatories with regard to expert witnesses, providing the same information as initially required in the interrogatory request. A supplemental response to Dr. Bond's interrogatories identified Dr. Staples as one of plaintiffs' experts. The supplemental answer noted, "The subject matter and substance of his testimony will be as previously stated in answer to Interrogatory No. 15."

Interrogatory No. 15 was answered in the following manner:

Defendant [Dr. Bond] failed to utilize recognized diagnostic methods for diagnosis when presented with anginal pain, and chest pain radiating to the arm, palpitation, and irregular heart beats. Such tests included:

Complete gastrointestinal examinations to confirm or disprove the diagnosis of hiatal hernia;

Comparative electrocardiographic studies;

Stress electrocardiographic examinations;

Thallium studies;

Holter monitor studies;

Angiographic studies;

Cardiac enzyme tests;

Referral to cardiac experts.

Nowhere in this answer do plaintiffs disclose that Dr. Staples will testify relative to Gene's longevity or quality of life.

Plaintiffs also rely on Dr. Staples' deposition in which he stated he would be willing to respond to any question Dr. Bond posed regarding Staples' expert opinion. They claim Dr. Bond then had the opportunity to discover Dr. Staples' opinion as to Gene's longevity and quality of life if other diagnostic and treatment methods had been utilized. Dr. Bond, however, points out the following exchange between his counsel and Dr. Staples at the deposition:

A. ... intervention back here—

Q. Back here, you're referring to what? A. 1976. That could have changed the course of events. I say could have. I don't know.

Q. There's no way anybody knows that? A. No. It could have changed the course of events.

. . . .

Q. ... There isn't any way, I take it, within a reasonable degree of medical certainty that you can testify that had something else been done differently back in 1976 that the outcome would have been any different? A. I can't testify to that, but I can testify that in my opinion the thinking process that was followed left something to be desired.

This line of questioning clearly reveals that plaintiffs did not alert Dr. Bond to the aspect of Dr. Staples' opinion that was requested at trial.

We have reviewed a trial court's allowance of testimony or imposition of sanctions for a party's failure ,to disclose the identity and opinion of its expert in response or in supplement to an interrogatory request in four recent cases. *See Hoekstra v. Farm Bureau Mut. Ins. Co.*, 382 N.W.2d 100, 108–09 (Iowa 1986); *Lambert v. Sisters of Mercy Health Corp.*, 369 N.W.2d 417, 421–23 (Iowa 1985); *Hubby v. State*, 331 N.W.2d 690, 697 (Iowa 1983); *Sullivan v. Chicago & N.W. Transp. Co.*, 326 N.W.2d 320, 324 (Iowa 1982). In *Hoekstra*, we concluded that the trial court did not abuse its discretion by limiting the

testimony of defendant's expert to the technical confines of defendant's interrogatory answer specifying the substance of the expert's opinion. 382 N.W.2d at 109.

 We conclude that the trial court's limitation of Dr. Staples' testimony to the matters designated in plaintiffs' answer to defendant's Interrogatory No. 15 was not an abuse of its discretion. It was not apparent from the supplemental answer to interrogatories or Dr. Staples' deposition testimony that he had formed an expert opinion, which he would relate at trial, on the longevity and quality of life effects of a different course of medical testing and treatment of Gene Bratton's heart condition. We note that Dr. Donald Green and Dr. Lester Beachy testified as experts for plaintiffs at a later point in the trial and both presented expert opinions on the matter excluded from Dr. Staples' testimony; therefore, we also conclude on this basis that plaintiffs suffered no prejudice by the limitation of Dr. Staples' expert opinion. *Cf. State v. Hicks*, 245 N.W.2d 319, 321 (Iowa 1976) ("[T]he exclusion of evidence tending to show a certain fact is not reversible error where the claimed fact in question is fully established by other admitted evidence.").

III. *Instructing the jury that doctor does not guarantee results.* Plaintiffs also argue that the trial court erred in instructing the jury. They claim that the insertion of the following sentence in Instruction 18, which set out the doctor's standard of care, confused the jury and injected a contract issue into a negligence case: "Nor does a physician, in accepting employment for the purpose of making a diagnosis and treatment, make any implied guarantee of results." The court overruled plaintiffs' timely objection to this sentence. Plaintiffs now claim this instruction constituted reversible error, because it prejudiced them by introducing an issue not raised by the pleadings or proof; specifically, it injected a contract concept into a negligence action. *See Adams v. Deur*, 173 N.W.2d 100, 113 (Iowa 1969).

Plaintiffs cite authority from the Michigan courts to support their argument.

*Dziurlikowski v. Morley,* 143 Mich.App. 729, 372 N.W.2d 648 (1985); *Gibson v. Henkin,* 141 Mich.App. 468, 367 N.W.2d 418 (1985); *Cleveland v. Rizzo,* 99 Mich. App. 682, 298 N.W.2d 617 (1980). In response, Dr. Bond exhaustively distinguishes these cases. While the Michigan appellate courts have been critical of the giving of the guarantor instruction in medical negligence cases, those courts have reversed the trial court in only one instance for adding this language to the standard jury instruction on professional negligence. *Dziurlikowski,* 143 Mich.App. at 732, 372 N.W.2d at 650. At the time *Dziurlikowski* was decided, it was presumptive error for a Michigan court to deviate from a standard jury instruction absent a good reason for doing so. Now Michigan follows the harmless error test for reviewing deviation from standard jury instructions, error being found only when the deviation results in unfair prejudice to the complaining party. *See Johnson v. Corbet,* 423 Mich. 304, 324–26, 377 N.W.2d 713, 724 (1985). The Michigan appellate courts also have cautioned their trial courts in the future not to add the guarantor language to the standard jury instruction even though it is an accurate statement of Michigan common law, because the language tends to confuse the jury by injecting contract language into a negligence action. *Gibson,* 141 Mich.App. at 475, 367 N.W.2d at 420–21; *Cleveland,* 99 Mich.App. at 685–86, 298 N.W.2d at 619–20. The result reached by the Michigan courts would not require a reversal in this case, however.

Dr. Bond points to Iowa cases from which the language of this instruction could be drawn. *See Moser v. Stallings,* 387 N.W.2d 599, 604–05 (Iowa 1986); *Sinkey v. Surgical Assocs.,* 186 N.W.2d 658, 660 (Iowa 1971) (overruled on other grounds in *Speed v. State,* 240 N.W.2d 901, 908 (Iowa 1976)); *Lagerpusch v. Lindley,* 253 Iowa 1033, 1037, 115 N.W.2d 207, 210 (1962) (quoting *Wilson v. Corbin,* 241 Iowa 593, 599, 41 N.W.2d 702, 705 (1950)); *Hair v. Sorensen,* 215 Iowa 1229, 1235, 247 N.W. 651, 654 (1933) (quoting *Berg v. Willett,* 212 Iowa 1109, 1112, 232 N.W. 821, 823 (1930)).

Plaintiffs asserted negligence and battery claims against the defendant-doctor in *Moser.* 387 N.W.2d at 601. An appeal reached us on two jury instructions. A part of one jury instruction in question stated "a physician does not impliedly warrant a cure or guarantee the best result." *Id.* at 605. We stated that the language of the jury instruction "may well apply in a case properly grounded on claims of warranty or *specific acts of malpractice in the treatment and diagnosis of the patient." Id.* at 604 (emphasis added).

In *Sinkey, Lagerpusch* and *Hair,* negligence theories were raised by the plaintiffs for recovery in their medical malpractice cases. In each of these negligence actions, we stated in setting forth the standard of care that the physicians did not guarantee or insure a correct diagnosis, cure or result. *Sinkey,* 186 N.W.2d at 660; *Lagerpusch,* 253 Iowa at 1037, 115 N.W.2d at 210; *Hair,* 215 Iowa at 1235, 247 N.W. at 654.

Plaintiffs based their action on Dr. Bond's negligent failure to perform specific tests and to refer Gene Bratton to a cardiologist for further diagnosis and treatment of his heart problem, rather than on a warranty theory. We conclude that the trial court aptly stated the status of the prior common law in its instruction; however, the court might have avoided this issue by using only the Iowa Uniform Jury Instruction language.

Iowa Uniform Jury Instruction 13.2 was adopted by the Iowa State Bar Association in 1984, during an update of our civil jury instructions. That instruction removed any reference to a physician's guarantee of results from the uniform instruction on the doctor's standard of care. *Compare* Iowa Uniform Jury Instructions 13.1 *and* 13.4 (1975) (containing implied "guaranty" language) *with* 1 Iowa Uniform Jury Instruction 13.2 (1984). The Iowa State Bar Association committee drafting this new instruction obviously had the same concern verbalized by plaintiffs here: the injection of guaranty language in the instruction might mislead or confuse the jury by the use of a

contract term in a negligence action. We share that concern.

■ Based on our prior cases, we conclude the court did not commit reversible error in giving the challenged language in Instruction 18. In the future, however, trial courts should not give guaranty language in a medical negligence case instruction. When an express warranty theory is involved in the case, guaranty language may be appropriate. *See* 1 Iowa Uniform Jury Instruction 13.13 (1984).

IV. *Exclusion of letter.* Plaintiffs appeal on five grounds from the trial court's ruling on the admissibility of a six-page letter being written at the time of his death by Gene Bratton to his brother. The letter recited the prognosis for Gene's heart condition as delivered by Dr. David Lemon, the cardiologist. In the letter Gene discussed his conversations with Dr. Lemon. He also summarized the content of his doctor-patient conversations with Dr. Bond. He commented on Dr. Bond's failure to perform tests from 1976 to 1982 and Gene stated that he frequently had complained to Dr. Bond of chest pains. Gene detailed Dr. Bond's treatment of Gene's heart condition during his hospitalization in July of 1982, three months prior to the writing of the letter. He then wrote of the despair resulting from his realization that his life would never be the same. The court sustained Dr. Bond's hearsay objection to the admission of the letter.

At trial plaintiffs argued that the letter was admissible under the hearsay exceptions of present sense impression, statement of then existing mental, emotional or physical condition, and statement under belief of impending death. *See* Iowa R.Evid. 803(1), 803(3), 804(b)(2). On appeal Brattons raise the rule 803(3) and 804(b)(2) exceptions as well as the "catch-all" exceptions of Iowa Rules of Evidence 803(24) and 804(b)(5). They also claim that even if the entire letter was not admissible certain portions should have been admitted by the trial court.

■ Dr. Bond urges us on appeal to consider only two hearsay exceptions raised by Brattons: statement of then existing mental, emotional or physical condition and statement under belief of impending death. *See* Iowa R.Evid. 803(3), 804(b)(2). He argues, and we agree, that error was not preserved by Brattons on the rule 803(24) and 804(b)(5) exceptions. *See Shill v. Careage Corp.*, 353 N.W.2d 416, 420 (Iowa 1984) (issue not raised at trial cannot be urged for the first time before this court). We also agree with Dr. Bond's argument that Brattons should not prevail on their argument that parts of the letter are admissible. When a document is offered only in its entirety, rather than in separate sections, and some parts require exclusion, the whole document must be excluded upon a proper objection. *Englund v. Younker Bros.*, 259 Iowa 48, 57–58, 142 N.W.2d 530, 535 (1966) (Lease offered only in its entirety contained extraneous matter prejudicial to defendant. The trial court properly excluded the entire document.).

Hearsay evidence is not admissible unless it fits within a recognized exception under the state constitution or statutes or our rules. *See* Iowa R.Evid. 802. We have recognized twenty-nine exceptions under our rules of evidence. Iowa R.Evid. 803, 804. We now turn to the two hearsay exceptions raised by Brattons both at trial and on appeal.

A. *Statement of then existing mental, emotional or physical condition.* Brattons argue that Gene's letter showed his state of mind and expressed his physical condition immediately preceding his death. To the extent the statement is relevant to prove pain and suffering as a part of the damages sustained, we need not address this issue because the jury did not award damages on plaintiffs' claims; however, we must address this issue as it relates to any liability of Dr. Bond on the medical negligence claim.

We will reverse the trial court's ruling only when there has been an abuse of its discretion in ruling on the circumstances triggering this exception. *State v. Stevens*, 289 N.W.2d 592, 597 (Iowa 1980); *see also* 2 S. Gard, *Jones on Evidence* § 10:17, at 296 (6th ed. 1972); C. McCormick, *Hand-*

*book of the Law of Evidence* § 297, at 707 (E. Cleary 2d ed. 1972).

We have held that excited utterances, including statements relating to state of mind and then existing physical condition, "must meet a requirement of spontaneity in order to possess a circumstantial guarantee of trustworthiness for admissibility." *Stevens*, 289 N.W.2d at 596; *see Rhiner v. City of Clive*, 373 N.W.2d 466, 476 (Iowa 1985); *State v. Ogilvie*, 310 N.W.2d 192, 196 (Iowa 1981). The rationale for admitting these types of statements is that the declarant did not have an opportunity to reflect on the occurrence and design a statement; spontaneity indicates the statement was reactive to the situation and not carefully thought out. McCormick, *Evidence* § 297, at 705–06; 2 *Jones on Evidence* § 10:6, at 266–69.

Plaintiffs argue that Gene's letter was written contemporaneously with the diagnosis of his condition and prognosis by Dr. Lemon. They assert that the shock, upset and anger Gene reported feeling at the time he received the diagnosis from Dr. Lemon had not lessened or changed in the two days during which he composed the draft letter.

Dr. Bond argued, and the trial court held, that the time lapse in the preparation of the letter caused it to appear reflective rather than spontaneous.

▓ In exercising its discretion to admit or exclude the letter, the trial court was required to decide as a preliminary issue of fact whether preparation of the letter by Gene was reflective or spontaneous. *See* Iowa R.Evid. 104; *cf. State v. Mateer*, 383 N.W.2d 533, 535 (Iowa 1986) (similar consideration necessary by trial court in determining admissibility of hearsay evidence under Iowa Rule of Evidence 803(2)). It is apparent from the court's dictation into the record of its reasons for excluding the letter that all the circumstances, including the time lapse, were considered in ruling that the statement was reflective and, thus, barred by the hearsay rule. We conclude that the court's ruling was a reasonable exercise of the court's discretion.

▓ **B.** *Statement under belief of impending death.* Iowa Rule of Evidence 804(b)(2) creates an exception to the hearsay rule for "dying declarations." To be admissible under this exception, it must satisfactorily appear from the declarant's express language or inferences fairly drawn from his condition that his sense of impending death was so certain that he was without hope or expectation of recovery. *State v. Rowley*, 216 Iowa 140, 145, 248 N.W. 340, 342 (1933); *State v. Sweeney*, 203 Iowa 1305, 1319–20, 214 N.W. 735, 741–42 (1927); *State v. Brooks*, 192 Iowa 1107, 1114, 186 N.W. 46, 50 (1922). The statement is then admissible only to show the cause and circumstances of what he believed to be his impending death. Iowa R.Evid. 804(b)(2). Wigmore, in his treatise on evidence, commented that the ruling of the trial court regarding the declarant's consciousness of impending death should not be disturbed. 5 J. Wigmore, *Evidence in Trials at Common Law* § 1442, at 298–301 (Chadbourn rev. 1974).

Brattons point to passages in Gene's letter to support their assertion that Gene had no hope of recovery. In one he wrote "it was too late for surgery and ... nothing could be done to cure my problem." Additionally, they claim he had distinguished between hope of recovery and hope of extension of lifetime.

Dr. Bond points to the passages of the letter in which Gene discussed drug treatment and dietary changes that he felt would lengthen his life expectancy. These comments, argues Dr. Bond, evidenced Gene's expectation of continued life. Dr. Bond also notes that the letter stated Dr. Lemon told Gene that he had patients live six or seven years with this condition but that Gene probably would not live to age seventy. At his death Gene was fifty-seven years old.

▓ The trial court considered all these factors, plus the fact Gene died while in the process of reworking the document, in ruling on the admissibility of the letter as a dying declaration. The court concluded that the letter lacked the guarantees of truthfulness normally found in a dying dec-

laration. Particularly, the court noted Gene was not under the belief that impending death was certain and had, in fact, contacted an attorney about a lawsuit against Dr. Bond. We commend the trial court on its analysis and explanation of the reasons for sustaining defendant's hearsay objection to the admission of the letter.

We conclude that the trial court's ruling was not an abuse of discretion in light of all the facts and circumstances before the court.

V. *Disposition.* In summary, we conclude that the trial court (1) did not abuse its discretion in limiting the testimony of Dr. Staples and excluding as evidence Gene's letter to his brother, and (2) did not commit reversible error in instructing the jury concerning a physician's standard of care.

Submitted with the appeal was the issue whether parts of the record designated by the defendant were unnecessarily included in the appendix. We now conclude the questioned portions were necessary for our consideration of the appeal. All costs in this court are taxed to plaintiffs.

AFFIRMED.