STATE OF IOWA, Appellee, v. CARRIE ROWLEY, Appellant.

No. 40947.

MAY 9, 1933.

Henry P. Daly and J. A. Dyer, for appellant.

Edward L. O'Connor, Attorney-general, and Walter F. Maley, Assistant Attorney-general, for appellee.

KINTZINGER, J.—Mrs. Miller testified that on August 23, 1930, she accompanied the deceased, Mrs. Helen Feori, her niece, to the home of the defendant, Carrie Rowley, in Des Moines. Mrs. Miller

was not aware of the purpose of the visit to defendant's home until about the time they arrived there. She had no idea what her niece wanted until they reached the Rowley home. Her niece never consulted with or asked her about having anything done. Mrs. Feori never asked her advice, and Mrs. Miller never gave any.

While there, she heard Mrs. Feori tell defendant she was about three months along. Mrs. Rowley told Mrs. Feori her price would be $10, which Mrs. Feori then paid. Then they went upstairs, where Mrs. Rowley placed Mrs. Feori on a bed. Then Mrs. Miller saw Mrs. Rowley insert a catheter and speculum into Mrs. Feori. After the operation, Mrs. Rowley told her niece to go home and take a dose of quinine and she would be all right. Mrs. Miller said the instruments shown as exhibits were similar to the instruments Mrs. Rowley inserted into Mrs. Feori.

Mrs. Miller said that Mrs. Feori was pregnant about two weeks before August 23. The operation was performed on Saturday, and Mrs. Miller again saw her niece the following Monday, when she was sick in bed and menstruating very badly. That afternoon Mrs. Feori showed her a very small form of a human being which had passed from her. Mrs. Feori died on September 2 following.

The appellant was not a physician or surgeon, and the record does not show that she was a nurse. The indictment is brought under section 12973 of the Code, which is as follows:

"If any person, with intent to produce the miscarriage of any woman, wilfully administer to her any drug or substance whatever, or, with such intent, use any instrument or other means whatever, unless such miscarriage shall be necessary to save her life, he shall be imprisoned in the penitentiary for a term not exceeding five years, and be fined in a sum not exceeding one thousand dollars."

It was necessary to show that the defendant performed an illegal operation upon Mrs. Feori by the use of an instrument, with intent to produce a miscarriage, that such miscarriage was not necessary to save the life of the deceased, and that Mrs. Feori died as a result thereof.

The defendant admitted to the officers arresting her in September that she had often done this kind of work; that she was forced into it by girls, and did not have the heart to refuse; that, if she had received $10 for every abortion she performed, she would

have barrels of money; that she was not ashamed of it; that she produced abortions to save disgraced girls for $10, and was glad to do it. The officers found many instruments used for that purpose in her home. Some of these were admitted in evidence. The defendant did not testify, and there was no denial of the evidence offered by the state.

■ It is the settled law of this state that a person who, in an unlawful attempt to produce a miscarriage, inflicts injury upon a woman, from which she dies, is guilty of murder in the second degree, unless the miscarriage was necessary to save her life. State v. Moore, 25 Iowa 128, 95 Am. Dec. 776; State v. Moon, 167 Iowa 26, 148 N.W. 1001; State v. Leeper, 70 Iowa 748, 30 N.W. 501.

■ I. Defendant claims the court erred in admitting the testimony of Bessie Miller uncorroborated on the alleged ground that she was an accomplice. An examination of the record shows that practically all of the testimony of Mrs. Miller went in without objection. Much of her testimony was also elicited on cross-examination. No such objection was urged during her entire examination.

At the close of the state's case, defendant's counsel moved to take from the consideration of the jury all of Mrs. Miller's testimony on the ground of her being an accomplice, because there was no corroboration as provided by section 13901 of the Code.

The testimony was admitted without objection. She can hardly claim ignorance of the grounds of this objection when the testimony was received, because her counsel at the beginning of her examination said to the court:

"Before this witness goes any further, I think she ought to be admonished that she has certain rights here that she can exercise if she desires; that there are about to be asked of her certain questions incriminating her, and I think she ought to be advised in regard to her rights thereto."

If the testimony was inadmissible for the reasons now urged, objections should have been made thereto when offered. Section 13901 of the Code provides:

"A conviction cannot be had upon the testimony of an accomplice, unless corroborated by other evidence which shall tend to connect the defendant with the commission of the offense; and the

corroboration is not sufficient if it merely show the commission of the offense or the circumstances thereof."

This statute does not bar the admission of such evidence, but prohibits a conviction thereon, unless so corroborated. The testimony itself was admissible, but, if there was no corroboration, the court should instruct there could be no conviction thereon.

The only error that could be relied on if there was no corroboration would be the court's failure to instruct the jury they could not convict unless the testimony was corroborated by other evidence tending to connect the defendant with the commission of the offense.

Although not requested, it would be the court's duty to so instruct, if there was no evidence of such corroboration, and if the evidence showed Mrs. Miller to be an accomplice. No such error is relied on, and no argument on such ground is made by the defendant.

In the first place, the evidence offered as related on first page hereof does not tend to show that Mrs. Miller was an accomplice; and in the second place, if it did, there was corroborating evidence connecting the defendant with the commission of the offense.

Her evidence was corroborated by the dying declarations of Helen Feori herself on the day she died. Therein she told her mother, Mrs. Canfield, that the defendant, Carrie Rowley, performed the abortion, and that she used instruments in so doing, and it was painful.

It was further corroborated by evidence of the police officers who seized the instruments used by defendant in such operations; by the testimony of Officer Castelline, who, in the presence and hearing of the defendant, was told by Mrs. Miller that Mrs. Rowley was the lady she saw perform the abortion on her niece; and in reading to Mrs. Miller, in the presence and hearing of the defendant, a statement previously made containing a statement that Mrs. Rowley committed an abortion on Mrs. Feori, and by asking Mrs. Miller if the statement was true; that she said it was—all without any protest or objection on the part of Mrs. Rowley.

This evidence was sufficiently corroborating to make Mrs. Miller's testimony admissible, although she was an accomplice.

II.  Complaint is also made of the admission of the testi-

mony of Mary Canfield as to dying declarations made to her by deceased.

It is the settled law of this state that dying declarations of decedent as to cause of death are admissible when it appears that such statements were made with the knowledge of impending death. State v. Gillick, 7 Iowa 287; State v. Johnson, 72 Iowa 393, 34 N. W. 177; State v. Schmidt, 73 Iowa 469, 35 N. W. 590; State v. Brumo, 153 Iowa 9, 132 N. W. 817; State v. Klute, 160 Iowa 170, 140 N. W. 864.

The evidence shows the operation was performed on August 23, 1930; that almost immediately thereafter the decedent became violently ill; that she was soon removed from her home to the hospital; that before she was removed she was advised by her physician that "there was very grave danger that she would not live." She died on September 2 following. Between August 27 and September 2 she developed a severe case of abdominal peritonitis. The doctor told her on August 27 that she was in a serious condition, and on the day of her death she told the doctor she was going to die. She also told her mother, Mrs. Canfield, she thought she was going to die. These statements were all made before the alleged dying declarations were made.

This evidence fairly tends to show that deceased was aware of her impending death. Thereafter she told her mother that a woman by the name of Carrie Rowley produced the miscarriage, and that she (Mrs. Rowley) used an instrument in doing it, and that it was painful. This evidence fairly tended to show that decedent believed she was going to die, and was aware of her impending death, when the declarations were made.

III. Defendant also complains of the admission of certain exhibits, claimed to have been obtained without a search warrant, in violation of the search and seizure provisions of the Constitution of Iowa. The writer of this opinion believes there might be some merit in this contention, notwithstanding our holding in State v. Tonn, 195 Iowa 94, 191 N. W. 530, provided the evidence showed the officers entered defendant's home without a search warrant. There was evidence in the record, however, tending to show they had a search warrant, and that it was read to Mr. or Mrs. Rowley. Neither Mr. nor Mrs. Rowley testified positively that the officers had no search warrant; on the contrary, three of the officers testified they had. Besides this, the record shows that most of these exhibits were

surrendered to the officers without protest. For these reasons we see no error in the admission of this testimony. This therefore, is not a case for a reconsideration of the doctrine announced in the Tonn case.

■ IV. It is also contended that the court erred in failing to instruct the jury about included offenses, especially abortion. The crime of attempting to produce an abortion under Section 12973 of the Code is a separate and distinct offense, and is not included in any of the offenses included in an indictment for murder.

If any offenses could be included within a charge of murder in second degree, it might be claimed to be manslaughter.

Our court in the case of State v. Moore, 25 Iowa 128, loc. cit. 137, 95 Am. Dec. 776, held that it was not error to refuse to charge the jury that they might convict the defendant of manslaughter under the indictment charging the defendant with murder by procuring a willful abortion. In that case the court says:

"The charge against the defendant was not negligence and unskillfulness in procuring an abortion under justifiable circumstances, but the willful procurement of an abortion without any necessity for it, whereby death was occasioned. If death unexpectedly results from such an act, the crime we have seen was at common law murder, and under our statute is murder in the second degree. Under the charge, and under the evidence, the defendant was guilty of murder in the second degree, or of nothing, and hence the court did not err in refusing to say to the jury that they might convict the defendant of manslaughter."

So in this case the only offense submitted was murder in the second degree, under instructions of the court. The only offenses that could have been included in this case, if any, would have been manslaughter. Under the evidence in this case, the defendant was guilty of murder in the second degree or of nothing. We therefore find that there was no prejudicial error in failing to instruct on any included offenses.

Counsel for appellant cite no authorities supporting her contention that the jury should have been instructed on the included offense of abortion, but allege that they could find none.

■ V. Complaint is also made of the court's instruction No. 7 because it failed to tell the jury that the act must be done willfully.

It is not necessary under an indictment of this kind to prove that the death was willfully caused. It is the law of this state that, where a death is caused by an unlawful act, it must be shown that the unlawful act was willfully committed. In such an act the law implies malice. State v. Moore, 25 Iowa 128, 95 Am. Dec. 776; State v. Gibbons, 142 Iowa 96, 120 N. W. 474, 475.

In the latter case this court said:

"The crime of murder in the second degree necessarily involves an act done with malice aforethought. * * * But that term used in defining the crime is technical rather than descriptive. It does not necessarily require an intent to murder. Malice aforethought may be implied where there is no intent to kill, but an intent to commit a felony from which death results, although that result is unintended. That death resulting from a criminal attempt to commit an abortion constitutes murder in the second degree is in this state well settled."

The complaint against instruction No. 7 is without foundation, because the matter complained of is fully covered by instruction No. 8 where the jury was told that one of the elements necessary to establish beyond a reasonable doubt was:

"1. That the defendant willfully, unlawfully and feloniously and with malice aforethought in Polk County on August 23, 1930, used an instrument upon the body and person of Mrs. Helen Feori with intent to produce a miscarriage."

VI. It is also claimed that the verdict was not sustained by the evidence and the law. As herein pointed out, where a death occurs as the result of an illegal abortion performed upon a female, the person committing the act is guilty of murder in the second degree.

An illegal abortion involves the following elements: (1) That the defendant willfully and unlawfully used an instrument upon a woman; (2) that the use of such instrument was with the intent of producing a miscarriage; and (3) that such miscarriage was not necessary to save the life of the woman.

Where these elements have been shown and a death results, the person committing them is guilty of murder in the second degree. The court covered these elements by instruction No. 8 as follows:

"Before you can find the defendant guilty of the crime of murder in the second degree as charged in the indictment you must find that the state has established each and all of the following numbered propositions beyond a reasonable doubt: 1. That the defendant willfully, unlawfully and feloniously and with malice aforethought in Polk County, Iowa, on or about August 23, 1930, used an instrument on the body and person of Mrs. Helen Feori, with intent to produce a miscarriage. 2. That the said Helen Feori died on or about the 2nd day of September, 1930. 3. That the use of such instrument by the defendant with intent to produce a miscarriage of the said Helen Feori, was the direct and natural cause of her death. 4. That the miscarriage of said Helen Feori was not necessary to save her life."

This instruction included all of the elements necessary to warrant a conviction, and, if established, the verdict was warranted. In our opinion, there was evidence fairly tending to establish all of the foregoing propositions.

[8] Defendant strongly contends that the state failed to prove that a miscarriage was not necessary to save Mrs. Feori's life.

The evidence shows that Mrs. Feori was a young woman twenty-three years of age, and up to the day of the operation was in good health. On the morning of the operation she was working around her home, and was healthy and happy. She had one child about seven months old, and the doctor who delivered that child saw her in July, 1930. In his opinion, he thought she was then pregnant. At that time he says she appeared to be in good health and in normal condition.

Her mother, Mrs. Canfield, and her aunt, Mrs. Miller, both testified that she was in good health.

The defendant was not a physician or surgeon, and was not consulted for any legitimate purpose. The defendant admitted in the presence of several witnesses that she was in the habit of performing operations of this kind, and did so in order to save girls from being disgraced. It was not necessary for defendant to show that an abortion was necessary to save a life, but, in view of these admitted statements, and in view of the condition of Mrs. Feori's health prior to the operation, we believe the jury was fairly warranted in finding that the operation was not necessary to save her life.

The testimony also shows without conflict that Mrs. Feori was pregnant at the time the operation was performed. Her mother, Mrs. Canfield, and her aunt, Mrs. Miller, both say that on the Monday following the operation a little shape of humanity came, and shortly afterwards the afterbirth came.

VII. The only remaining complaint is that the evidence failed to show beyond all reasonable doubt that the use of the instrument with intent to produce a miscarriage of Helen Feori was the direct and natural cause of her death. The evidence offered fairly tends to show that up to the time of the operation the deceased was in good health; that immediately after the operation she became sick; that as soon as she returned home she was confined to her bed; that her condition became progressively worse; she became violently ill, suffered intense pain, and finally developed general peritonitis. This verdict is supported by the evidence of her aunt, Mrs. Miller, her mother, Mrs. Canfield, and by medical testimony.

Dr. Sharp, her attending physician, from August 27, 1930, until her death, found that she first had a mild degree of pelvic inflammation, probably the beginning of peritonitis following an abortion. He had no doubt an abortion had been performed. He also said that in his opinion she was suffering from the effects of an abortion; that from his observation of his patient, and from the autopsy performed almost immediately after her death, the cause was undoubtedly an early abortion.

Dr. Weingart said the cause of death was septic inflammation of the tubes, the uterus walls, and tissues about the uterus. The infection was started recently.

Physicians at a post mortem testified they found signs of a recent pregnancy. They found a good deal of free pus in the abdominal cavity and signs of a general peritonitis. The Fallopian tubes were infected and contained pus. The cause of death was due to septic inflammation of the tubes, the uterus walls, and tissues about the uterus. The infection was recent, and started within two or three weeks, because it was acute peritonitis. From the history of the case the autopsy showed an abortion had been performed.

From the evidence introduced the jury was fairly warranted in finding that the death resulted from the operation.

We have reviewed the evidence and instructions of the court as applied thereto, and believe the defendant had a fair trial, and

that the verdict is sustained by the law and the evidence. The judgment of the lower court is therefore affirmed.

Kindig, C. J., and Evans, Stevens, Albert, and Anderson, JJ., concur.