# IN THE COURT OF APPEALS OF IOWA

No. 17-0680
Filed October 10, 2018

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**ELIAS WALTER WANATEE,**
        Defendant-Appellant.
_____


Appeal from the Iowa District Court for Woodbury County, Duane E. Hoffmeyer, Judge.


A defendant appeals his conviction for murder in the second degree. **AFFIRMED.**


Mark C. Smith, State Appellate Defender, and Theresa R. Wilson, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Louis S. Sloven, Assistant Attorney General, for appellee.


Heard by Vogel, P.J., Tabor, J., and Blane, S.J.*

*Senior judge assigned by order under Iowa Code section 602.9206 (2018).

**TABOR, Judge.**

Elias Wanatee appeals his conviction for second-degree murder in the stabbing death of Vernon Mace. Wanatee claims his trial counsel was ineffective in two ways: (1) by not effectively objecting to hearsay testimony relaying Mace's identification of "Eli" as his attacker, and (2) by not seeking to exclude testimony from "a jailhouse snitch." Relatedly, Wanatee argues the cumulative effect of counsel's errors prejudiced his chances of acquittal. Wanatee also faults the district court for allowing the state medical examiner to describe two of Mace's nine cuts as "defensive wounds" and for admitting into evidence a diagram from a forensic pathology textbook illustrating the concept of "defensive wounds."

To answer Wanatee's first two claims, we find no shortfall in counsel's performance. Because the victim's statements qualified as dying declarations, counsel did not need to object. And because the informant's testimony was admissible, counsel did not breach a duty in choosing impeachment over exclusion. Finally, Wanatee cannot show he was prejudiced by the references to "defensive wounds."

## I. Facts and Prior Proceedings

"Tom, call an ambulance. I think Eli stabbed me in the lung." Tom Abbe and Anna Edwards recalled Mace uttering those words as he stood at Abbe's front door bleeding from a gaping head wound.[1] Later in her trial testimony, Edwards captured the severity of Mace's condition: "He looked like someone dropped a

---

[1] Both Wanatee and Mace had been inside Abbe's Sioux City residence earlier that night. Wanatee slipped out the back sliding doors while Mace left by the front door. Abbe and Edwards later heard "screaming and hollering" and went to the back deck to investigate. Edwards recognized the raised voices as those of Wannatee and Mace.

bucket of red paint on him. . . . It was like taking a pulse. I mean, it was like every time his heart beat, you could see [blood] squirting out the side."

As Edwards dialed 911, Kim Stahle pulled up outside Abbe's house in a Kia Optima. Stahle saw Mace standing in the yard, holding his stomach. Mace ducked into the residence for less than a minute, then stumbled toward Stahle's car, pleading: "Please take me to the hospital." Stahle drove as fast as she could to the ambulance bay at Mercy Hospital—arriving just after two in the morning. En route, Stahle asked Mace "Who did this to you?" He responded: "Eli." When Stahle arrived at Mercy, she ran to the bay doors and said, "I think there's a dead guy in my car."

The emergency room nurse moved Mace from the Kia passenger seat into a wheelchair. The nurse remembered Mace was breathing, but "lethargic, meaning slightly unresponsive." When medical personnel removed Mace's blood-soaked clothes, they saw several lacerations. Doctor Suman Tandra noted stab wounds to Mace's scalp, face, abdomen, chest, and forearm. Mace was moaning but generally unresponsive. Dr. Tandra believed Mace was in hemorrhagic shock, a condition that occurs "when the body loses significant amount of blood, typically over 20 percent, and the heart unfortunately cannot function efficiently and [pump] enough blood to your vital organs."

Dr. Tandra called a trauma surgeon, but Mace went into cardiac respiratory arrest and the trauma team's efforts to resuscitate him were unsuccessful. Mace died about an hour after arriving at the hospital.

Called to investigate the fatal stabbing, Sioux City police officers interviewed Abbe, Edwards, and Stahle. Those interviews exposed Wanatee as

the prime suspect. Wanatee and Mace had a connection not just by their presence at Abbe's house the previous night, but through Wanatee's marriage to Mace's niece, Nelitta Taylor.

Officers located and arrested Wanatee at a nearby apartment building around 11 a.m. After the arrest, a detective interviewed Wanatee, who denied confronting Mace earlier that morning. Wanatee said witnesses might be blaming him because he recently split up with Taylor. Wanatee acknowledged stopping by Abbe's house that night but said he left alone and saw "nobody else in the street. Nobody else chased me down, nobody else said anything to me, and I just kept going."

These statements to the detective differed from the story he told a fellow inmate at the Woodbury County jail. According to Michael Bergin, Wanatee said "he got in an altercation and stabbed somebody" five times. Bergin claimed Wanatee told him the victim "died because he bled out because he didn't seek medical attention."

An autopsy by Dr. Thomas Carroll chronicled nine stab wounds. The doctor believed two fatal wounds likely pierced the victim's liver and chest cavity. Dr. Carroll also described a "slashing laceration" and a "shallow stab laceration" to Mace's left forearm. Dr. Carroll opined the victim was facing his attacker when he received those stab wounds.

The State charged Wanatee with murder in the first degree. Wanatee filed a notice of self defense. His first trial ended in a hung jury. The district court granted a change of venue to Pottawattamie County for the second trial, which began in February 2017. Defense counsel's closing argument in the second trial

emphasized the animosity between Mace and Wanatee stemming from their tense encounter witnessed by Taylor. She testified to seeing her uncle pull a gun on Wanatee during a contentious car ride about a month before the stabbing. Counsel argued: "Mace pulls out a gun, puts it to the back of Eli's head, and then grabs the back of his neck while he's driving the car with three other people in it. You have to ask yourself: Where did that come from?"

The jury found Wanatee guilty of murder in the second degree. For that conviction, he received an indeterminate sentence of fifty years. Wanatee now appeals.

## II. Scope and Standards of Review

Because Wanatee's complaints about counsel's performance spring from the Sixth Amendment of the U.S. Constitution and article I, section 10 of the Iowa Constitution, we review them de novo. *See State v. Canal*, 773 N.W.2d 528, 530 (Iowa 2009). We review evidentiary rulings, including decisions about the admissibility of expert testimony, for an abuse of discretion. *State v. Tyler*, 867 N.W.2d 136, 152 (Iowa 2015).

## III. Legal Analysis

### A. Ineffective Assistance of Counsel

In two key challenges to his second-degree murder conviction, Wanatee alleges deficiencies in the performance of his trial attorney. First, Wanatee claims counsel should have objected to the admission of hearsay evidence as failing to satisfy the exception for statements made under the belief of imminent death. *See* Iowa R. Evid. 5.804(b)(2). Second, he assails counsel for not seeking to exclude testimony from a jailhouse informant as inherently unreliable, or alternatively, for

not requesting an instruction to warn the jury about the unscrupulous motivation of informant witnesses.  On both claims, Wanatee bears the burden of showing his attorney failed to perform an essential duty and prejudice resulting from counsel's failure.  *See State v. Button*, 622 N.W.2d 480, 483 (Iowa 2001).  If he cannot show both prongs by a preponderance of the evidence, we will affirm.  *See id.*  We preserve ineffective-assistance claims for postconviction-relief proceedings if the record is inadequate to evaluate counsel's performance, but we will address them on direct appeal when the record allows.  *See State v. Neitzel*, 801 N.W.2d 612, 624 (Iowa Ct. App. 2011).

### 1.  Hearsay Exception for Dying Declarations

At issue are two statements by Mace identifying Wanatee as his attacker. The State offered the first statement through the testimony of Abbe and Edwards. Both witnesses recalled a bleeding Mace came to the door of Abbe's house and volunteered: "I think Eli stabbed me in the lung."  Stahle shared the second statement.  While she raced Mace to the hospital, Stahle asked, "who did this to you?" and he replied, "Eli."

During Abbe's testimony, the prosecutor asked: "Did Vernon Mace say anything when he came through the front door covered in blood?"  Defense counsel objected on hearsay grounds.  The prosecutor agreed the answer would be hearsay, but asserted it was admissible under several exceptions: "Present sense impression, excited utterance, then-existing physical condition, and also I believe it would qualify as a statement impending death."  The court overruled the objection and allowed Abbe to answer.

The defense did not renew the objection when the prosecutor elicited the same hearsay statement from Edwards. The defense also lodged a hearsay objection when the prosecutor asked Stahle what she said to Mace while driving to the hospital. Although the court sustained the objection to the prosecutor's question, the defense did not object again when the prosecutor asked about Mace's response identifying "Eli." Because Wanatee is critical of these anemic efforts by his trial attorney to block the hearsay statements, Wanatee raises the issue as ineffective assistance of counsel on appeal. He contends counsel should have objected to statements by Mace identifying Wanatee as his assailant. Wanatee insists the statements were not "true dying declarations and were inadmissible hearsay."

Hearsay—defined as an out-of-court statement "offered in evidence to prove the truth of the matter asserted"—is inadmissible unless it falls under an exception allowed by the constitution, state law, or another rule of evidence. Iowa R. Evid. 5.801(c), 5.802. One exception to the rule against hearsay is a dying declaration, defined as "[a] statement that the declarant, while believing the declarant's death to be imminent, made about its cause or circumstances." *Id.* r. 5.804(b)(2).

For a declaration to be admissible under this exception, "it must be clear from the circumstances that the declarant's 'sense of impending death was so certain that he was without hope or expectation of recovery.'" *State v. Harper*, 770 N.W.2d 316, 320 (Iowa 2009) (quoting *Bratton v. Bond*, 408 N.W.2d 39, 45 (Iowa 1987)). A declarant's realization he is in danger of death is insufficient—rather, "[t]he words must be spoken under solemn conviction of impending dissolution."

*State v. Brooks*, 186 N.W. 46, 50 (Iowa 1922). But it is not "necessary to prove, by expressions of the deceased, that he was apprehensive of immediate death, nor that he was *inarticulo mortis*."[2] *State v. Nash*, 7 Iowa 347, 349 (1858).

Wanatee contends his counsel should have argued Mace's solicitation of a ride to the hospital from Stahle demonstrated Mace was not without hope or expectation of recovery. Wanatee argues Mace signaled his belief "treatment was still an option." The State counters that Mace's request for a ride to the emergency room did not mean he expected to survive—and "the sheer amount of blood, the locations of his stab wounds, and his difficulty breathing all supported a clear inference from his condition: Mace knew he would die without medical attention, and knew that he could not expect to live until he received it."

We agree with the State's position. Wanatee's desire for emergency assistance did not defeat his conscious awareness of impending death from his many stab wounds—one of which he believed to have pierced his lung. A similar fact pattern emerged in *State v. Drosos*. 114 N.W.2d 526 (Iowa 1962), *superseded by statute on other grounds as recognized in State v. Lyman*, 776 N.W.2d 865 (Iowa 2010). There, the victim identified Drosos as the person who stabbed him in the stomach and then pleaded, "For God's sake, hurry up and get a doctor'" as he received assurance an ambulance was on the way. *Id*. at 532. Our supreme court affirmed the trial court's denial of the defense objection, contending the State failed to lay proper foundation to show statement was dying declaration. *Id*.

---

[2] The Latin phrase "in articulo mortis" translates to "the article of death" or "at the point of death." *In Articulo Mortis*, *Black's Law Dictionary* (7th ed. 1999).

Similarly, courts from other jurisdictions have held victim statements qualified as dying declarations even when the victims called for an ambulance. *See, e.g.*, *People v. Siler*, 429 N.W.2d 865, 868 (Mich. Ct. App. 1988) (holding 911 recording reflected a dying declaration when victim called emergency), *superseded by rule on other grounds as stated in People v. Orr*, 739 N.W.2d 385 (Mich. Ct. App. 2007); *State v. Hamric*, 151 S.E.2d 252, 265 (W. Va. 1966) (upholding admission of decedent's description of being shot in his own yard to the driver of the ambulance he called); *State v. Beauchamp*, 781 N.W.2d 254, 258 (Wis. Ct. App. 2010) (finding no abuse of discretion in admitting victim's assertions about who shot him made during ambulance ride where victim expressed concern when ambulance passed one hospital on its way to another).

Mace told Abbe to call an ambulance because Mace believed he received a stab wound to a vital organ. But rather than wait for the ambulance to arrive, Mace asked Stahle, the nearest driver, for a ride to the hospital. When Stahle brought Mace to the ambulance bay, she frantically told hospital staff: "I think I have a dead guy in my car." *See Harper*, 770 N.W.2d at 320 (noting witnesses thought victim was dead upon her arrival at the hospital).

Considering all these circumstances, we conclude Mace believed his death was impending when he identified Wanatee as his attacker. Because Mace's hearsay statements were admissible under the exception at rule 5.804(b)(2), trial counsel did not breach an essential duty in not urging more objections. *See State v. Rice*, 543 N.W.2d 884, 888 (Iowa 1996) (holding counsel has no duty to raise meritless objections).

### 2. Jailhouse Informant Testimony

Wanatee next criticizes his trial attorney for not advocating to exclude Bergin's testimony. Bergin claimed Wanatee confessed to the stabbing while they were both incarcerated in the Woodbury County jail. Wanatee characterizes Bergin as a "jailhouse snitch" and contends, at minimum, counsel should have sought a cautionary instruction to alert jurors to the "less-than-altruistic" motives of such witnesses.

Bergin did not testify at the first trial ending in a hung jury. But the prosecutor called Bergin for the retrial and provided the defense with a copy of his plea agreement with the State. Defense counsel objected to a portion of Bergin's expected testimony about Wanatee's alleged admissions but did not seek to exclude his testimony in full. After an offer of proof, the district court overruled the defense objection to Bergin's testimony.

Bergin told the jury Wanatee mentioned he had an "altercation" and "ended up stabbing a guy." On cross-examination, Bergin acknowledged his two prior felony convictions. Defense counsel also highlighted Bergin's persistence—he sent two letters in attempt to notify jail staff about the incriminating statements allegedly made by Wanatee. Bergin also admitted he had access to television and newspapers at the jail. On redirect, Bergin said he received no benefit from the State for supplying information about Wanatee.

On appeal, Wanatee urges: "Trial counsel provided ineffective assistance when he failed to challenge the admission of testimony by Bergin—a jailhouse informant—or request other remedial measures." Citing several law review articles and academic studies, Wanatee claims "[t]he testimony of jailhouse informants has

been labeled 'inherently unreliable' and a contributing factor in wrongful convictions."

Wanatee asked our supreme court to retain this case to address his contention Iowa "should adopt measures to address the inherent unreliability of jailhouse informant testimony, including exclusion, disclosure, reliability hearings, or the use of cautionary instructions." Because the supreme court transferred the case to us, we must apply existing law to counsel's performance. Any expansion of the duties placed on defense counsel when faced with the testimony of jailhouse informants rests with our supreme court. *See generally Rosauer Corp. v. Sapp Dev., L.L.C.*, 856 N.W.2d 906, 907 (Iowa 2014) (finding it appropriate for court of appeals to defer to supreme court on potential expansion of judicially created doctrine).

Our supreme court recently addressed the "problematic" use of jailhouse informants "to obtain information from defendants represented by counsel." *State v. Marshall*, 882 N.W.2d 68, 81 (Iowa 2016). But even the *Marshall* majority acknowledged "the State is not deprived of evidence because the defendant, acting on his own, has exercised poor judgment." *Id.* at 83. Counsel "need not be a 'crystal gazer' who can predict future changes in established rules of law in order to provide effective assistance to a criminal defendant." *State v. Effler*, 769 N.W.2d 880, 889 (Iowa 2009) (quoting *State v. Schoelerman*, 315 N.W.2d 67, 72 (Iowa 1982)). Under existing case law, we find no breach of duty in trial counsel's handling of Bergin's testimony.

### 3. No Cumulative Error

On top of his two defined claims of ineffective assistance, Wanatee alleges a cumulative impact from counsel's errors. *See State v. Clay*, 824 N.W.2d 488, 500 (Iowa 2012). Because we detect no breach of duty by trial counsel, Wanatee's cumulative error argument fails. *See Schrier v. State*, 347 N.W.2d 657, 668 (Iowa 1984) (reviewing effect of various claims "both individually and cumulatively" and finding the appellant did not establish he was denied a fair trial).

### B. Admissibility "Defensive Wound" Testimony and Diagram

Wanatee next argues the district court abused its discretion in allowing an expert witness to use the term "defensive wound" and in admitting a diagram from the *Handbook of Forensic Pathology* showing "various ways in which 'defensive wounds' may be received." Dr. Carroll, who performed the autopsy, testified for the State. The State also called State Medical Examiner Dennis Klein as an expert witness. Dr. Klein did not examine Mace's body, but reviewed the autopsy report and photographs. Dr. Klein agreed the cause of death was multiple stab wounds. But unlike Dr. Carroll, Dr. Klein characterized the lacerations to Mace's left forearm as "defensive wounds."

Before the first trial, Wanatee moved in limine to prevent Dr. Klein from referring to any of Mace's injuries as "defensive wounds." After reviewing *Tyler*, 867 N.W.2d at 166, the district court found Dr. Klein was qualified to give an expert opinion under Iowa Rule of Evidence 5.702 and "defensive wound" was a "term of art" in forensic pathology that did not go to the ultimate issue the jury had to decide. *See* Iowa R. Evid. 5.704. The district court reaffirmed its original limine ruling before the second trial.

When Dr. Carroll testified at the retrial, defense counsel broached the concept of "defensive wounds" on cross-examination. Dr. Carroll defined the term as "wounds sustained on the hands or upper arms presumably in the defense of someone attacking them with a sharp instrument such as a knife." Dr. Carroll explained he had not characterized any of Mace's nine injuries as "defensive wounds" because he believed use of the terminology would be "speculative" without video documentation of the altercation.

On redirect, the prosecutor introduced the following page from a forensic pathology textbook depicting "defensive wounds."



118                              Handbook of Forensic Pathology

Figure 7.6     Various ways in which "defense wounds" may be received.

STATE'S EXHIBIT #302

Defense counsel objected on relevance and foundation grounds.[3]  The court overruled the objection but did not allow the prosecutor to impeach Dr. Carroll with the depiction.

The State later called Dr. Klein as an expert witness.  He explained "defensive wound" was "a term used by forensic pathologists when a wound is found usually on the upper extremities, so on the forearm or the hand."  When asked how victims usually sustained defensive wounds, Dr. Klein responded:

> Usually defensive wounds are when a victim of a sharp force injury, when they are trying to protect usually their head or their body from the attack in a gesture.  This is usually an instinctive type of behavior that people would have.  And as a result, the person is going to receive an injury to that part of the body with the intent that they're going to protect the more vital areas such as their face and chest.

Dr. Klein then characterized the two punctures to Mace's forearm as defensive-type wounds.  On cross, Dr. Klein clarified he was not offering an opinion on who was the aggressor in the attack.

On appeal, Wanatee argues the court should have excluded Dr. Klein's testimony Mace received two "defensive wounds" to his forearm as irrelevant, unfairly prejudicial, and not helpful as an expert opinion under Iowa Rules of Evidence 5.401,[4] 5.403,[5] and 5.702.[6]  Wanatee contends the terminology "has no

---

[3] On appeal, Wanatee contends counsel was ineffective in not also objecting under Iowa Rule of Evidence 5.703.  As with the other claims of ineffective assistance of counsel, we find no breach of duty because the State did not offer the diagram to form a basis for Dr. Carroll's testimony.

[4] "Evidence is relevant if: a. It has any tendency to make a fact more or less probable than it would be without the evidence; and b. The fact is of consequence in determining the action."  Iowa R. Evid. 5.401.

[5] "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Iowa R. Evid. 5.403.

[6] Rule 5.702 provides:

relevance" where justification is the noticed defense. He worries the words were likely to confuse the jurors. And he argues the admission of the textbook diagram would compound that confusion. He asserts the diagram was prejudicial because it suggested how Mace may have sustained the injuries to his forearm "without any basis in fact."

In the State's view, Wanatee "opened the door" to evidence about "defensive wounds" by asking Dr. Carroll about his classification of the injuries. The State contends it had a right to respond to Dr. Carroll's cross-examination testimony that he declined to label Mace's arm wounds as defensive.

"A party opens the door by offering admissible evidence that in turn triggers admissibility of responsive evidence by an opposing party." *State v. Huser*, 894 N.W.2d 472, 507 (Iowa 2017). But here, the State did not intend to wait for the defense to open the door before introducing Dr. Klein's testimony. By the time of Wanatee's retrial, the district court had denied the defense motion to limit Dr. Klein's discussion of "defensive wounds." Defense counsel tried to take the sting out of the expected testimony by eliciting evidence from Dr. Carroll that he did not use that classification in his autopsy report. We do not find the cross-examination of Dr. Carroll waived the defense objection to this evidence.

That point settled, we turn to Wanatee's opposition to Dr. Klein's description of "defensive wounds" without direct knowledge of how the fight unfolded. This

---

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.

same issue arose in a Tennessee postconviction case. The Shelby County medical examiner testified the victim suffered "some defensive wounds" and explained "defensive wound" was "a term of art that was developed in forensics to indicate the injuries occurred when a person was trying to protect themselves." *Jones v. State*, No. W2007-1086-CCA-R3-PC, 2008 WL 4489668, at *6 (Tenn. Crim. App. Oct. 6, 2008). The medical examiner told the court he was reluctant to use the term in front of a jury because, as a pathologist, "he was not present when the wound was inflicted and could not definitively say how the wound occurred." *Id.*; *accord People v. Paschall*, 456 N.Y.S.2d 828, 830 (App. Div. 1982) (holding question whether incision on victim's arm occurred while "warding off a blow or by some other means" was not a fact uniquely within knowledge of doctor performing autopsy and by stating wound was defensive, expert usurped jury's function); *but see Vergara-Martinez v. State*, No. 65853, 2016 WL 1375648, at *2 (Nev. Apr. 5, 2016) (allowing expert testimony describing cuts to the victim's wrist as "defensive wounds" despite doctor's absence from scene of attack because opinion was based on his observations as treating physician in emergency room).

Without reaching the underlying evidentiary question of whether a pathologist may properly express an opinion on the "defensive" nature of a wound without witnessing the altercation, we conclude Wanatee cannot show he was prejudiced by the disputed testimony from Dr. Klein or the textbook diagram of "defensive wounds." *See Jones*, 2008 WL 4489668, at *10 (finding Jones failed to prove how medical examiner's use of the contested term prejudiced him).

When presented with nonconstitutional error, as we are here, we ask: "[D]oes it sufficiently appear the rights of the complaining party have been

injuriously affected by the error [so] that he has suffered a miscarriage of justice?" *State v. Trudo,* 253 N.W.2d 101, 107 (Iowa 1977). Error may only be predicated on a ruling admitting or excluding evidence when a substantial right of the party is affected. Iowa R. Evid. 5.103(a).

Wanatee secured Dr. Carroll's testimony that it would be "speculative" to classify any of Mace's nine wounds as "defensive." Even Dr. Klein acknowledged he had no opinion regarding the identity of the aggressor in the attack. And Wanatee did not tell investigators Mace was the aggressor. Rather, Wanatee denied fighting with Mace. Given the State's evidence that (1) Mace received nine stab wounds, several of which caused major damage to his head and torso, and (2) Wanatee suffered no wounds at all, Dr. Klein's use of the term "defensive wounds" for two injuries to Mace's arm did not substantially affect Wanatee's rights. Even if the court improperly allowed the references to "defensive wounds," the admission was harmless error.

**AFFIRMED.**